Filed 6/2/15  P. v. Green CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B253829 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA398518) |
| v. | |
| DAMIEN GREEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Drew E. Edwards, Judge.  Affirmed.

A. William Bartz, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Damien Green (Green) was charged with home invasion robbery of Javier Tovar Salazar (Salazar) (Pen. Code, § 211, count 1);[1] home invasion robbery of Jose Peralta (Peralta) (§ 211; count 2); home invasion robbery of Fidel Saguilan (Saguilan) (§ 211; count 3); attempted robbery of Mark Tombo (Tombo) in an inhabited dwelling (§§ 664, 211; count 4); and possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a); count 5). The information alleged that counts 1 through 4 involved offenses committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members. (§ 186.22, subd. (b)(4).) In addition, as to counts 1 through 4, the information contained serious felony allegations pursuant to section 1192.7, subdivision (c)(28), personal use of a firearm allegations pursuant to section 12022.53, subdivisions (b) and (e)(1), and prior conviction allegations pursuant to section 667.5, subdivision (b). Green was found guilty of counts 1, 2, 3, and 5 and sentenced to a total of 19 years 8 months. He was given custody credit for 562 days and 84 days good time/work time for a total credit of 646 days. The trial court dismissed the gang enhancement on its own motion.

On appeal, Green contends that the trial court erred when (1) it failed to sanction the People under section 1054.5 for providing late discovery of field identification cards (F.I. cards) identifying Green as a gang member, and (2) it admitted evidence regarding threats against certain prosecution witnesses instead of excluding it under Evidence Code section 352. We find no error and affirm.

## FACTS

During trial, the prosecutor offered evidence that Green, Marvin Hernandez (Hernandez) and Maynor Juarez (Juarez)[2] forced their way into room 7C at the Royal

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Hernandez and Juarez were codefendants at trial. They are not parties to this appeal.

Viking Motel, which was occupied by, inter alia, Peralta, Salazar, Saguilan and Tombo.[3] Tombo left the room and went to ask the hotel manager for help. Hernandez and Green had guns. While Juarez stood by the door, Hernandez and Green proceeded to take cell phones, a computer and cash from the room.

Police officers responded to the scene, and two of them were directed to search room 18 of the motel for suspects. Prior to going into room 18, they ordered people out of room 19 as a precaution. Green came out. He was allowed to leave because the officers had no reason to suspect that he was a perpetrator. The officers located Juarez in room 18, and he was thereafter identified by Salazar and Tombo as one of the robbers. When Salazar saw Green walking toward the motel's exit, she alerted nearby officers, who detained him. Eventually, Hernandez was also apprehended.

After being advised that Green had been seen exiting room 19 and was in custody, officers searched the room. They found, inter alia, a laptop and a cell phone that belonged to Salazar.

Green was kept in a holding tank at the police station. As he was lying on the tank's bench, an officer asked him to stand. He did. On the bench, the officer saw a plastic baggie covered in spittle that appeared as though it had been vomited up. There was a white wafer inside the baggie. Testing later confirmed that the white wafer contained a usable amount of cocaine base.

One of several gang experts testified that he met Green in 2008, and had contact with him on numerous occasions. Green was a self-admitted gang member who went by the moniker of Big Squeaks. He belonged to a subclique of the 18th Street gang called Columbia Lil' Cycos or C.L.C. According the expert, Green had tattoos of a one and eight on his neck, his left leg, and chest. During his testimony, the expert answered questions about various F.I. cards that he and his partner filled out on Green.

---

[3]     Peralta, Saguilan, Salazar and Tombo are transgender. At trial, respectively, they went by Selina, Cindy, Gina and Lindsey. When using pronouns referring to these individuals, we have used female pronouns.

A different gang expert testified that he had contact with Green on several occasions prior to trial, and he admitted to being in the 18th Street gang.

## DISCUSSION

### I.  The F.I. Cards.

According to Green, the trial court erred when it failed to either exclude three F.I. cards as late discovery, offer Green a continuance to conduct a proper investigation into the F.I. cards, or to give the jury a late discovery instruction.  We disagree.

A.  Relevant Proceedings.

On March 28, 2013, the matter was in department 100 for trial.  The matter was continued based on a stipulation.  On April 25, 2013, the matter was sent to department 127 for trial, and the parties began jury voir dire.  At one point, the trial court took a break to consider and grant a motion by the prosecutor to have Green's gang-related tattoos photographed.  The prosecutor noted, "According to the F.I. cards, it looks like [Green] has one on the left side of his neck, one on the right side of his neck, and one on his left calf."  The voir dire continued on April 29, 30, and May 2, 2013.

On May 3, 2013, the jury was sworn in.  Prior to opening arguments, the parties and trial court engaged in the following colloquy:

"DEFENSE COUNSEL:  I have three F.I. cards for Mr. Green.  I believe this is late discovery.  I made a request earlier in this case for F.I. cards.  I was advised in August of 2012, there were no F.I. cards.  I think it was only three weeks ago in Department 100 I received these three cards.

"THE TRIAL COURT:  [Prosecutor, defense counsel] indicated he received F.I. cards three weeks ago; is that correct?

"PROSECUTOR:  I am looking to see the date those were turned over.

"THE TRIAL COURT:  We will put that issue over.  The timing is not an issue—we'll table that issue for the moment.  Before we have any testimony regarding F.I. cards, you can find out when they were actually turned over.

"PROSECUTOR:  In my opening statement, however, I was planning on making reference to them, not specifically stating F.I. cards.  They wouldn't know what that is.

4

Some reference to the fact they are documented.  That is how they are documented.  If the [trial court] is not going to allow the F.I. card[s], that would seriously affect the case because the gang expert is relying on those contacts.  [¶]  Also, it would change my opening somewhat.  Going off of my memory, I can let your Honor know it was well more than three weeks ago.  I was in a murder trial three weeks ago.  I am going to continue to look.  It was before trial began.

"THE TRIAL COURT:  Thank you.  [¶]  We are here in trial.  . . . [defense counsel] has indicated the F.I. cards were not turned over before trial.  That is right on the borderline of being late discovery in this case.  Even for the sake of argument, even if the F.I. cards were turned over three weeks before trial, in my view, that is ample enough to ask for more time to make the appropriate investigation.  Over the objection of the defense, the [trial court] is going to allow the field identification cards to come in.  I do not believe that violates [section 1054.7]."

B.  Applicable Law.

A prosecuting attorney is required to disclose to a defendant or his or her attorney "[a]ll relevant real evidence seized or obtained as part of the investigation of the offenses charged."  (§ 1054.1, subd. (c).)  The disclosure of evidence must be made "at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred."  (§ 1054.7.)  "If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred."  (*Ibid.*)

"Upon a showing that a party has not complied with Section 1054.1 . . . and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of [Chapter 10 of the Penal Code pertaining to discovery], including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or

5

any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5, subd. (b).)

Orders under section 1054.5 shall not be disturbed unless the trial court abused its discretion.  (*People v. Superior Court* (*Mitchell*) (2010) 184 Cal.App.4th 451, 459 [section 1054.5 grants discretionary powers].)

C.  <u>No Abuse of Discretion</u>.

The parties agree that based on the record, it is likely that the F.I. cards were turned over on March 28, 2013.  In other words, they agree it is most likely that defense counsel received the F.I. cards 28 days before the matter was sent to department 127 for trial.

The purpose of section 1054 et seq. "'is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain information in order to prepare their cases and reduce the chance of surprise at trial.  [Citation.]'" (*Thompson v. Superior Court* (1997) 53 Cal.App.4th 480, 487.)  We note that defense counsel never argued that the F.I. cards should be excluded, that the late discovery necessitated a continuance so he could conduct an investigation, or that the trial court should instruct the jury that the prosecutor had provided late discovery.  In the absence of any indication to the contrary, the trial court reasonably inferred that defense counsel had ample opportunity to conduct an investigation and prepare for trial.  Consequently, we conclude that the trial court did not abuse its discretion.

Even assuming that there was an abuse of discretion, it was harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Verdugo* (2010) 50 Cal.4th 263, 280.)  Under that standard, we will reverse only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)

According to Green, he was prejudiced because the admission of the F.I. cards "allowed the jury to speculate that the F.I. cards reflected arrests for other crimes that [Green] may have committed, i.e., the F.I. cards amounted to improper character evidence [in] the form of prior bad acts.  The . . . evidence was very important to the

prosecution's case" because it refreshed the memory of an officer that Green admitted he was an 18th Street gang member with the moniker Big Squeeks and was part of a clique known as the Columbia Lil' Cycos or C.L.C.S. This allowed the officer to express his expert opinion that Green was an active 18th Street gang member based on his contact with Green in preparing the F.I. cards.

In our view, Green's prejudice argument misses the mark. The question is not whether the F.I. cards aided the prosecutor's case and therefore prejudiced Green. Nor is the question whether the F.I. cards should have been excluded because they constituted improper character evidence pursuant to Evidence Code section 1101, subdivision (a). Those objections were not raised below, and we deem them waived. (*People v. Clark* (1992) 3 Cal.4th 41, 127.) The question is whether defense counsel's late receipt of the F.I. cards undermined his ability to present a defense. Because Green has not addressed this question, our analysis need not go any further.

## II. Threats Made to Prosecution Witnesses.

According to Green, the trial court violated Evidence Code section 352 and his right to a fair trial when it ruled that Peralta, Saguilan and Salazar could testify that they were threatened and told not to testify.

This argument lacks merit.

A. Relevant Proceedings.

During a pretrial hearing, the prosecutor argued that Salazar should be allowed to testify that she was afraid to identify Hernandez at his preliminary hearing because she had been threatened by members of the 18th Street gang. According to the prosecutor, Salazar's fear due to the threats was relevant to her testimony and credibility. The trial court stated that it was "mindful of the fact that one of the elements of the robbery charge is the element of fear of the victim. In my view, the information that these gentlemen may be members of a gang is relevant to the issue whether or not the alleged victims were in fear. [¶] I am not going to exclude any testimony in this case regarding rumors whether or not these gentlemen were involved in gangs."

7

Later in the same hearing, Hernandez's attorney objected to Peralta and Saguilan testifying that they had been threatened on the grounds that there was no nexus between the threats and Hernandez. Green and Juarez joined. The trial court ruled that the evidence should be excluded under Evidence Code section 352 because there was no nexus between the threats and these defendants, and the evidence would be highly prejudicial.

At that point, the prosecutor stated: "Can I ask for clarification? Regarding the previous ruling as to [Green] where your honor had ruled that it would be acceptable to ask the witness specifically, [Salazar] in particular, about her fear of testifying, based on these rumors that were heard, also included in that are these threats. [¶] At the preliminary hearing, she would not identify [Hernandez], she said based on her fear because she had been threatened after the crime had occurred. [Because the defense may try to impeach Salazar] with her non-identification, I think it is relevant to her credibility that she is not identifying because she is afraid."

After the trial court heard argument from Green's counsel, it stated: "I am going to modify my ruling. I do believe the fear that the witnesses suffered is, in fact, probative to the issues in this case." The trial court ruled that the witnesses could testify that they were threatened, but they could not testify that those threats came from Green, Hernandez or Juarez. Further, the trial court indicated that defense counsel could follow up regarding the source of the threats.

At trial, Salazar was asked if she was afraid to testify and she said yes. Asked why, she said, "I have been threatened. My life has been threatened." Hernandez's attorney objected based on hearsay.

The trial court held a hearing outside the presence of the jury and asked the prosecutor to inquire about the source of the threats. Salazar explained that Green and Peralta were both in jail at the same time, and Green told Peralta to tell Salazar that she would be killed if she testified, and that if Salazar went to court, she should testify that she sold her things, i.e., phone and laptop, in exchange for drugs. Through a different

8

friend, an 18th Street gang member threatened to kill Salazar. The trial court ruled that evidence of the threats was admissible because it was relevant to Salazar's credibility.

When the jury returned, the trial court read the following instruction: "In a moment, you will hear of threats from this witness on the stand. The evidence is not to be offered to show the proof of the matter asserted. In other words, it is not offered to show the threats were actually made. The evidence is only being brought in the trial for the limited purpose to show the effect on the witness for you to decide the witness's credibility."

Salazar was asked why she was scared to be in court. She testified that after the robbery, a Hispanic warned her not to go to court, suggesting that otherwise she would be harmed. Later, an 18th Street gang member with blond hair and facial tattoos said Salazar would be killed if she went to court. He also told her what to say if she testified. After being threatened, she refused to go to court, which resulted in her being arrested on a bench warrant. Subsequently, when Peralta was in jail, a detainee told her to tell Salazar she should say that the victims were not robbed, and that the things taken had been exchanged for drugs.

At one point, the prosecutor asked if Salazar saw any of the robbers in the courtroom. She said she did not. The prosecutor indicated that while Salazar was testifying, she was covering her face with her hair, leaning down and not facing him. He asked if she was afraid to identify anyone in the case. She said, "Yes, but I don't see anybody." He said, "Can I ask you to look around the courtroom [for the robbers]?" She said, "No." She said she was afraid she would be killed if she made an identification.

When Saguilan testified, she was asked if she "received threats in this case." She said yes. To the jury, the trial court stated: "I want to remind all of the jurors, if you . . . hear testimony [about alleged threats made against the witness], that testimony is being offered only to show the effect o[n] the credibility of the witness. The testimony is not offered to show the truth of the matter asserted, that the threats were actually made." Saguilan testified that she was threatened on two occasions by 18th Street gang members.

9

When Peralta referred to a threat in her testimony, the trial court instructed the jury as follows: "[T]he testimony about any threats are offered for the limited purpose to show the state of mind of the witness. They are not being offered to show the statements are, in fact, true." Peralta proceeded to testify that 18th Street gang members attempted to dissuade her from testifying by threatening violence, and by offering to return money stolen during the robbery.

B. Applicable Law.

A trial court can exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (Evid. Code, § 352.) "The prejudice referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1396.) A ruling under Evidence Code section 352 is reviewed for an abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

The admission of evidence in violation of state law violates the federal right to due process if the error "rendered the defendant's trial fundamentally unfair. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 70.) Evidentiary error giving rise to a constitutional violation is subject to review under the harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [error not reversible unless harmless beyond a reasonable doubt].

C. No Abuse of Discretion; No Denial of a Fair Trial.

Green contends that the threat evidence elicited from Peralta, Saguilan and Salazar should have been excluded because the prejudice outweighed the probative value. In particular, he contends that the threat evidence had minimal relevance, and it posed the risk that it would be misused by the jury.

According to case law, "'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.' [Citations.] Evidence of any explanation of the basis for such fear is likewise relevant to the jury's assessment of the witness's credibility and admissible for

10

that nonhearsay purpose, but not for the truth of any matters asserted.  [Citation.]"
(*People v. Chism* (2014) 58 Cal.4th 1266, 1291–1292.)  Thus, the threat evidence had significant probative value.  It tended to explain the apprehension exhibited by Peralta and Saguilan, and why Salazar did not identify Green, Hernandez and Juarez during the trial, and it thereby bolstered their credibility.

Moreover, the evidence had no undue prejudicial impact because the trial court repeatedly admonished the jury it could use the threat evidence only to assess the state of mind of the witnesses, and not for proof of the matters asserted, i.e., that threats were actually made.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725 [it is presumed that limiting instructions were followed].)

The trial court ruled within the bounds of its discretion.  Consequently, there was neither state law error nor constitutional error.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
          ASHMANN-GERST


We concur:


_____, P. J.
    BOREN


_____, J.
    HOFFSTADT