Filed 7/9/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C071489 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF105047) |
| v. | |
| JASON STEPHEN SIGUR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, Stephen L. Mock, Judge.  Affirmed as modified.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Jennevee H. de Guzman, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I, III, IV, V, VI, and VII of the Discussion.

1

Defendant Jason Stephen Sigur appeals from a judgment of conviction following a jury trial. After meeting in an Internet chat room, defendant engaged in a sexual relationship with a thirteen-year-old girl for approximately two months, including in the home where the victim lived with her mother and grandmother after secretly entering through the victim's bedroom window for that purpose. He was charged with 11 counts of contacting or communicating with a minor (Pen. Code, § 288.3, subd. (a) (Counts 1, 15-16, 21-22, 27-28, 33, 36, 39, 41)),[1] one count of kidnapping for purpose of lewd act upon a child (§ 207, subd. (b) (Count 2)), nine counts of first degree burglary (§ 459 (Counts 3, 17-18, 23-24, 29-30, 34, 37)), 20 counts of lewd and lascivious acts upon a child under fourteen (§ 288, subd. (a) (Counts 4-14, 19-20, 25-26, 31-32, 35, 38, 40)), and failure to register as a transient sex offender (§ 290.011, subd. (a) (Count 42)). It was further alleged that Count 2 came within the meaning of section 667.8, subdivision (b); Counts 3, 17-18, 23-24, 29-30, 34, and 37 came within the meaning of section 667.5, subdivision (c)(21); Counts 4-6 and 8-14 came within the meaning of section 667.61, subdivisions (a) and (b); and Counts 2-14, 17-20, 23-26, 29-32, 34-35, 37-38, and 40 came within the meaning of section 667, subdivision (a)(1), due to defendant's prior conviction of a serious felony. A jury found defendant guilty on all counts and found the sexual conduct enhancement allegations true. In a bifurcated proceeding, the trial court found all strike allegations true. The trial court sentenced defendant to a determinate term of 103 years in prison plus an indeterminate term of 550 years to life.

On appeal, defendant contends that: (1) the prosecutor engaged in misconduct by misstating the law regarding reasonable doubt; (2) the trial court erred in denying defendant's section 1118.1 motion for judgment of acquittal as to the burglary counts because the evidence showed that the victim consented to his entry into the home

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

knowing his intent to engage in sexual acts with her; (3) the prosecutor engaged in misconduct by misstating the law regarding the consent defense to burglary; (4) the cumulative effect of the prosecutorial misconduct requires reversal of the burglary counts; (5) section 288.3 is unconstitutionally vague; (6) section 288.3 is unconstitutionally overbroad; and (7) the fifteen-year enhancement imposed under section 667.8, subdivision (b), must be stayed because sentence was stayed on the underlying count.

We agree with defendant that the enhancement under 667.8, subdivision (b), must be stayed. We reject each of defendant's other contentions.

In the published portion of this opinion, we address and reject defendant's consent defense contentions regarding the burglary counts. We hold that when a defendant does not have an unconditional possessory right to enter as an occupant of the premises, a defense of consent to enter the premises for the purposes of engaging in felonious sexual conduct with a minor requires one of the following: (1) the minor has a possessory interest in the premises coequal to the parent or other adult owner/occupant and expressly and clearly invited the defendant to enter so the defendant could engage in felonious sexual conduct with the minor; or (2) a parent or other adult who has a possessory interest in the premises expressly and clearly gave the defendant permission to enter for the purpose of engaging in felonious sexual conduct with the minor; or (3) the minor expressly and clearly gave the defendant permission to enter for the purpose of engaging in felonious sexual conduct with the minor, the minor had been given permission by the parent or other person with a possessory interest to allow entry into the premises for such purpose, and defendant knew that the minor had been given such permission. The evidence here did not establish any of the aforementioned alternatives.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Trial Evidence

A.B. testified that she was born on June 21, 1997.  A.B.'s parents, D.B. (mother) and C.B. (father), were divorced and A.B. alternated every other week between her mother's and father's homes.  At the time of her contacts with defendant, A.B. had a cell phone with Internet access and had access to a home computer at her mother's home.  When she stayed at her father's home, she was not allowed to use her cell phone except to call her mother, and she did not have access to a computer there.  When A.B. stayed at her mother's home, she occupied the front bedroom, her grandmother occupied the rear bedroom, and D.B. slept on the sofa in the living room.

A.B. testified that in late 2009, when she was 12 years old, she began visiting an online chat room on the airG website.  Because airG required users to be at least 14 to create a profile and chat, A.B. created a profile listing her age as 14.  She would visit the "singles" and "20's" chat rooms to chat with others online every day.  Her parents were unaware of her participation in these chat rooms.

In late August 2010, when A.B. was 13, she met defendant in a chat room when she asked whether anyone in the 916 or 530 area codes was in the chat room and defendant responded.  A.B. viewed defendant's profile, which indicated he was in his twenties.  A.B. and defendant began chatting privately, and A.B. then gave defendant her cell phone number.  Defendant sent A.B. a text message and they communicated by text messages for about 90 minutes.  During this initial conversation, A.B. revealed that she was actually 13 and defendant revealed that he was actually 35, and the two agreed to meet in person.  A.B. asked defendant to visit her, and later that same day, defendant met A.B. outside her mother's home.  He arrived in a purple Ford Ranger pick-up.  Thereafter, defendant and A.B. took a 20-minute walk together.  They agreed that if they ran into someone who questioned their age difference, they would say defendant was A.B.'s uncle.

4

A.B. testified that she and defendant continued to communicate via text messages daily, and defendant came to visit her at her mother's house several days later. They walked to a more secluded area where defendant and A.B. kissed for a while and at defendant's request, A.B. orally copulated him. During this visit, defendant told A.B. that he wanted to have sex with her. A.B. was a virgin at that time and she told him she was worried that it wasn't the right time for her and that her mother would find out. She also told him that she was worried he would leave her afterward, and defendant reassured her and told her that he loved her. A.B. then went to stay at her father's house for a week, but she and defendant continued to send each other text messages when she was able to use her cell phone. They discussed their feelings for each other and agreed to become a couple.

When A.B. returned to her mother's home the following week, she and defendant arranged to meet a third time. Defendant asked if he could come visit A.B. at her mother's house, and she said yes. This time, defendant came to her bedroom window at night. Defendant pulled off the window screen and A.B. sat on the window sill. A.B. testified that she and defendant kissed and defendant touched her breast and vagina. Defendant again told A.B. that he wanted to have sex with her and she felt somewhat pressured but said she was not ready. Defendant was outside A.B.'s window for several hours and then came inside her room to say good night. A.B. promised him that she would have sex with him the next time he visited her.

A.B. again went to her father's house for a week, and she and defendant continued to send each other text messages and spoke over the phone. She told defendant she would "keep [her] promise." A.B. testified that she felt like she had to keep her promise to have sex with defendant because she did not know him very well and "for a while [she] was scared that he was going to try to hurt [her] or pull a weapon on [her]." The next week when A.B. returned to stay with her mother, defendant and A.B. planned for him to come over for the fourth time, again at night while A.B.'s mother was sleeping.

5

A.B. testified that when defendant arrived, she "just told him to come in" and defendant climbed through A.B.'s bedroom window. Defendant kissed and fondled A.B. and removed her clothing. A.B. orally copulated him and then defendant had vaginal intercourse with her. After this fourth visit, defendant made five or six similar visits to A.B. between September and October 15, 2010, and they had vaginal intercourse and she performed oral sex on defendant each time.

At some point during this time period, A.B.'s father, C.B., found messages from defendant on A.B.'s cell phone and confronted her about them. A.B. told her parents that defendant was a 14-year-old boy who skateboarded in the neighborhood. After that, A.B. was not allowed to bring her cell phone to her father's home and her mother would confiscate the phone at night while A.B. was staying at her mother's home.

C.B. testified he had a phone conversation with a person who identified himself as Jason[2] and sounded like an adult. C.B. asked Jason if he knew A.B. was a minor, and the man said A.B. told him she was 18. C.B. told him not to call back because she was only 13. He also told the man he would involve the sheriff's office if the man contacted A.B. again. C.B. told A.B. he did not appreciate her talking to an adult and not to contact him again. C.B. took A.B.'s phone from her.

A.B. testified that on October 14, 2010, she was supposed to return to stay with her father, but she told defendant that she did not want to go there and wanted to stay with defendant instead. Defendant had previously told A.B. that he wanted her to come live with him. Defendant agreed to take A.B. that night to stay with him. When defendant arrived, A.B. again opened her window to let defendant come into her room.

---

[2] C.B. initially recalled that he interrupted a phone conversation A.B. was having, took the phone from her and spoke to Jason at that time. Later, he acknowledged he had told a deputy sheriff he had seen inappropriate text messages and called the number associated with those messages. Ultimately, he said he was not sure who initiated the call.

A.B. packed her clothing and possessions, and defendant brought her a bag to carry them and helped her pack. A.B. did not pack her cell phone because her mother had it in the living room. She left with defendant through the window around midnight, and they replaced the window screen. Defendant drove a white Yukon, which he said he borrowed because his pick-up was out of gas. They planned to tell others that A.B.'s father could no longer take care of her and defendant was a friend of her father's. They stopped at Walmart for various sundries for A.B. on the way to defendant's home, which was in a trailer park in Woodland. When they arrived at defendant's trailer, defendant and A.B. had vaginal intercourse. Defendant then returned the Yukon, which he had borrowed from his estranged wife. Afterward, they returned to the trailer and had vaginal intercourse a second time.

A.B. testified that the next morning, October 15, she and defendant woke up early and went for a walk, during which A.B. met defendant's former roommate, Brandon K. A.B. testified that defendant received two or three phone calls, and A.B. saw that one of them was her mother calling from A.B.'s cell phone. Defendant then went to school, leaving A.B. alone in his trailer.

D.B. testified that when she discovered A.B. was missing on the morning of October 15, she called 911 and called C.B. Suspecting that A.B. was with defendant, who she thought to be a 14 year old in the neighborhood, D.B. then called his number from A.B.'s phone and left a message that she was looking for A.B. After a deputy sheriff arrived at D.B.'s home in response to her 911 call, D.B. checked the household computer and found a conversation with defendant on A.B.'s instant messenger account, which she provided to the deputy.

Deputy Laura Bradshaw testified that after interviewing C.B. and D.B. and obtaining defendant's cell phone number, she received authorization to ping the cell phone and found its location in Dunnigan. She then contacted the Yolo County Sheriff's Department and requested a welfare check at that address. Deputies Roman Keister and

7

Matthew Davis conducted the welfare check and spoke with a woman who informed them that defendant was her stepmother's husband but no longer lived there. She told the deputies that defendant lived at a nearby trailer park and drove a purple truck. The deputies went to the trailer park and found a purple Ford Ranger with a license plate registered in defendant's name parked next to a trailer. Deputy Keister testified that A.B. responded to their knock on the trailer door. She asked Deputy Keister if her parents were with him. He explained that they were not, but that they were worried about her. She told the deputies that she did not want to be there and she was afraid that she would never see her parents again. Deputy Keister testified that A.B. then hugged and thanked him.

A.B. was taken to the sheriff's department where she was interviewed by two detectives. A.B. initially lied to the first detective, Detective Dean Nyland, about having sex with defendant because she was afraid of getting in trouble and felt awkward talking about it. Detective Nyland testified that he thought A.B. would be more comfortable talking to a female detective, and Detective Jennifer Davis took over the interview. A.B. then told Detective Davis the full story and admitted that she had a sexual relationship with defendant.

Thereafter, A.B. was taken to a hospital where she underwent a forensic sexual assault examination. Dr. Angela Rosas testified that she collected swabs of semen from A.B.'s vagina and underwear. It was later determined that the DNA from these swabs matched defendant. Additionally, DNA from semen found on A.B.'s mattress cover in her room at D.B.'s home matched defendant.

Defendant's former roommate, Brandon K., testified that defendant asked him to move out of the trailer because his girlfriend was moving in with him. Additionally, Brandon K. testified that defendant had talked about A.B. by her first name and bragged about having sex with her. He testified that on the morning of October 15, defendant introduced him to A.B. as his girlfriend.

8

The prosecution presented additional evidence, including a receipt from Walmart and security video footage showing defendant and A.B. at the cash register at 1:36 a.m. on October 15, 2010. Further, there were cell phone records of numerous calls and text messages between defendant and A.B.

While being transported to the sheriff's office after his arrest, defendant asked why he had been arrested and Deputy Keister told him that he was wanted for questioning about a missing girl found in his trailer. Defendant replied, "What girl[?] When I left this morning no one was in my trailer."

Defendant was later interviewed by Detective Nyland. Initially, he said he only met in person two women he had first met in chat rooms, but denied meeting anyone else from a chat room in person. He denied knowing anyone in El Dorado Hills and denied even knowing where El Dorado Hills was located or how to get there. He admitted receiving a voicemail from a D.B., but said the call came from a phone number he did not recognize. In the voicemail, D.B. said something about her daughter being missing, but defendant said he had no idea who D.B. was. He denied ever hearing the name A.B. or meeting anyone with A.B.'s first name in a chat room. He denied picking A.B. up at her house and taking her to his trailer. He said he did not know A.B. and claimed he never met A.B.

Early in the interview defendant claimed he met a young female at his trailer park the day of his arrest who approached him and asked what it was like to live there. He first said the girl appeared to be 15 or 16. Later in the interview, when asked how he would explain his DNA inside the victim, he said the girl he met at the trailer park that day had flirted with him and followed him into his trailer. He said nothing happened between the two of them and that when he left his trailer, there was nobody there. Later, he said the girl indentified herself by her first name [A.] and that he had actually met her in a chat room in June. Defendant claimed she told him she had just turned 18. He claimed that she came on to him and he had vaginal intercourse with her in his trailer.

9

Thereafter, at her request, they walked around the trailer park together. Defendant denied ever going to the girl's house, but said they had texted each other daily since they met in the chat room. He said multiple times that he did not know how the girl got to his trailer park and that day had been the first time he physically met the girl. He said he did not know in advance that she was coming. On multiple occasions during the interview, he denied picking her up at her house. He also denied entering the house through the girl's window and said the last time he had climbed through a window was when he was 17. Multiple times during the interview, he denied ever going to the girl's house. And he denied being with the girl in Walmart earlier that morning. In contrast to his earlier statement that the girl was around 15 or 16, at this point in the interview he claimed the girl seemed at least 18 to him.

While defendant was in custody at the jail, he asked a volunteer to send a message to A.B.'s email on his behalf. The message said, "[H]e still loves you and asks that you please write him."

Defendant did not present any testimony in his defense.

### Verdict and Sentencing

The jury found defendant guilty on all counts and found all sexual conduct enhancement allegations true. In a bifurcated proceeding, the court found the strike allegations true.

The trial court sentenced defendant to a total determinate term of 103 years in prison plus an indeterminate term of 550 years to life.

### DISCUSSION

### I. Prosecutor's Comment on Reasonable Doubt

### A. Background and Defendant's Contentions

During closing argument, defense counsel argued the following: "[T]he thing about -- with reasonable doubt is that it has two separate components to it, and it is our highest legal standard of proof, but also it is that it has to have an abiding conviction,

10

meaning that the decisions you make as to this case ha[ve] to last over time.  Not just during the course of your deliberations, not just from a week or two from now, the decisions that you make in regards to this case have to last you for the rest of your lives.  That is how important these concepts are . . . .  [¶]  And just as a hypothetical anyways is that you would be able to bring this whole concept of reasonable doubt to you [*sic*].  We used to be able to get up and be able to argue with you that the decision you make is as important as the decision that you make in who you choose to marry.  [¶]  You know what, we can't make that argument any more because what we know of some statistics is that most marriages, they end in five years.  So what that means is that you did not have an abiding conviction as to who you chose to marry, and to be able to sync this all home to you is that you might want to think about that, that the decisions that you make here in this courtroom during deliberations are even more important than who you choose to spend the rest of your life with.  [¶]  That is what it means to be able to review the evidence beyond a reasonable doubt."

The prosecutor responded to defense counsel's argument in rebuttal.  The following argument, objection, and ruling took place at that time:

"[THE PROSECUTOR]:  I'm going to close with talking about reasonable doubt a little bit.  When I sit and I listen to [defense counsel] it sounds like, oh, my gosh, that is so such an unattainable standard, but it is not an unattainable standard.  Excuse me.  [¶] Every juror -- jury across the nation uses the same standard and jurors return guilty verdicts every day.  The standard is the same in a DUI case as in a murder case, and DUI convictions come along every day.  Murder convictions come along every day.  It is not an unattainable standard.  It is -- and *it's not analogous to you deciding to get married.  I mean, those two things don't even -- aren't in the same ballpark, the same playing field.* [¶]  Being convinced beyond a reasonable doubt just means you feel good about your decision.  You feel you're making the right decision, and you're going to feel that way tomorrow --"  (Italics added.)

11

"[DEFENSE COUNSEL]: Objection --

"[THE PROSECUTOR]: -- and the next day.

"[DEFENSE COUNSEL]: -- misstatements.

"THE COURT: Overruled.

"[THE PROSECUTOR]: And you're going to feel that way the next day, and the next day. You're not going to question yourself. That's all it means. [¶] And in this case aren't you convinced, is there any doubt in your mind as you sit here right now that the defendant has been having sex with [A.B.] since mid August? Is there any doubt in your mind that he kidnapped her on October 14th, and that he had sex with her two times on October 15th. [¶] The evidence in this case is overwhelming, and as you sit here today you should have no doubt in your mind of the truth of the charges."

Defendant contends that the prosecutor engaged in misconduct by misstating the law on reasonable doubt and this misconduct prejudiced defendant. Specifically, he contends that the prosecutor "temporally quantified 'abiding conviction' in terms of 'feel[ing] good' for a few days about the decision."

## B. Analysis

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

A prosecutor commits misconduct when she misrepresents the standard of proof or trivializes the quantum of evidence required to meet the standard of proof. (*Hill*, *supra*,

12

17 Cal.4th at pp. 828-829.) "When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion." (*People v. Booker* (2011) 51 Cal.4th 141, 184-185 (*Booker*); see also *People v. Pierce* (2009) 172 Cal.App.4th 567, 572 (*Pierce*).)

Defendant claims reversible error based on the comments preceding his timely objection, which was expressly grounded on misstatement of the law, and the court's decision to overrule that objection, as well as the comments the prosecutor made thereafter. Defendant contends that the following comment by the prosecutor was misconduct: "Being convinced beyond a reasonable doubt just means you feel good about your decision. You feel you're making the right decision, and you're going to feel that way tomorrow. . . ." Defendant argues this was a misstatement of law because it impermissibly reduced the prosecution's burden of proof to a mere duty to persuade jurors to make a decision about which they felt good. In context, we do not see it that way. The prosecutor's remarks before *and* after the objection make plain that she was not equating her burden of proof with the creation of good feelings but was illustrating the lasting and permanent nature of the term "abiding."

The prosecutor argued, "You feel you're making the right decision, and you're going to feel that way tomorrow -- [¶] -- and the next day. [¶] . . . [¶] And you're going to feel that way the next day, and the next day. You're not going to question yourself." This argument was responsive to and consistent with defense counsel's argument that "the decisions you make as to this case ha[ve] to last over time. Not just during the course of your deliberations, not just from a week or two from now, the decisions that you make in regards to this case have to last you for the rest of your lives." Contrary to defendant's interpretation, the prosecutor's comments did not imply that the jury's "abiding conviction" only had to last a few days; the language "the next day, and the next day" implied perpetuity. Much like defense counsel's remarks, the prosecutor's

13

comments evoked the concept of permanence. (See *Pierce*, *supra*, 172 Cal.App.4th at pp. 573-574 [no reasonable likelihood that jury was misled by prosecutor's remarks evoking permanence].)

The trial court did not err by overruling the defense objection to the prosecutor's argument. There is not a reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion. (*Booker*, *supra*, 51 Cal.4th at pp. 184-185.) No reasonable juror would have understood the prosecutor's argument to mean that, contrary to the court's instructions, an "abiding conviction" merely required the jury to " 'feel[] good' for a few days about the decision." The prosecutor's argument was neither deceptive nor reprehensible, and it did not constitute misconduct. (*Hill*, *supra*, 17 Cal.4th at p. 819.)

Even if the prosecutor's remarks amounted to misconduct, the remarks were not prejudicial. The evidence against defendant was overwhelming. (See *Booker*, *supra*, 51 Cal.4th at p. 186 [jury properly instructed on the prosecution's burden of proof and evidence of defendant's guilt was overwhelming]; *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1264, 1268-1269 [prosecutor's use of puzzle picture of the Statue of Liberty with missing pieces to illustrate reasonable doubt was misconduct, but the error was harmless, in part, because of the strength of the evidence].)

Here, the trial court properly instructed the jury on reasonable doubt. The court read the standard reasonable doubt instruction during the preliminary instructions at the beginning of the trial. It reread the instruction as part of the predeliberation instructions. Additionally, the court reinforced the primacy of that instruction by instructing the jury that if "the attorneys' comments about the law conflict with my instructions, you must follow my instructions." The evidence against defendant -- including A.B.'s testimony, the circumstances of how and where she was found, the DNA evidence, the electronic communications between defendant and A.B., and defendant's false statements to the police -- was overwhelming.

14

Defendant argues that the evidence was not overwhelming on the nine burglary counts, because he presented a "highly persuasive" consent defense grounded on A.B.'s invitation to enter her room on each occasion. The prosecutor's purported misstatement as to reasonable doubt, according to defendant, was particularly prejudicial on these counts. We disagree. We address the consent defense in more detail, *post*. For now, we note that the evidence is overwhelming on the burglary counts as well. The evidence of defendant's nocturnal and clandestine visits, his false statements about never visiting the victim's house, and the inference from this evidence that he knew A.B.'s mother did not authorize his visits or give A.B. permission to allow these visits negate his consent defense.

Considering the record as a whole, including the trial court's instructions and the overwhelming evidence of guilt, we conclude that even if the prosecutor's argument was misconduct, any error was harmless beyond a reasonable doubt.

## II. Burglary and the Consent Defense

### A. Background and Defendant's Contentions

At the conclusion of all of the evidence, defendant moved for judgment of acquittal as to five of the burglary counts, contending that A.B.'s testimony was insufficient to support a jury finding that defendant entered D.B.'s home on five of the charged occasions.[3] The trial court denied defendant's motion on the basis raised by defendant, finding sufficient evidence to proceed to jury deliberation on these counts. The court then considered a separate basis for a judgment of acquittal that defendant did not raise himself: "There is a separate issue, and that is a consent issue. . . . [¶] . . . To

---

[3] In his opening brief, defendant contends that he moved for a "judgment of acquittal as to *all nine* burglary counts" and implies that he did so on the basis of the consent defense. (Emphasis added.) This characterization of defendant's motion is not supported by the record. In fact, defendant moved to dismiss five of the burglary counts (counts 18, 24, 30, 34, and 37), contending there was insufficient evidence of entry.

15

support a consent defense the evidence has to show that the occupant, that is [A.B.], expressly invited the defendant into the bedroom. [¶] In reviewing my notes I don't find any evidence of an express invitation before October 14th or October 15th. So I don't find that one of the prerequisites to a consent defense is supported by the evidence. The jury may take a different tack on this, but I would not dismiss any of the burglary charges based on a purported consent defense until -- through October 14th, 15th." The court reasoned that while there was evidence of A.B.'s express consent to enter the home on October 14th, the night of the kidnapping, there was not sufficient evidence that A.B. knew of defendant's felonious intent. Thus, the court ruled that "the consent defense would [not] justify dismissing any of the burglary charges." However, the court later instructed the jury on the consent defense in a special instruction requested by defendant.[4]

On appeal, defendant contends the trial court erred in ruling an " 'express invitation' " is required to establish the consent defense to burglary charges. Defendant also argues that the trial court should have granted his section 1118.1 motion because there was substantial evidence that A.B. consented to defendant's entry into her mother's home and did so with knowledge of his felonious intent, i.e., that defendant intended to have sex with her.

---

[4] Defendant's special instruction read as follows: "Consent is a defense to the charge of burglary. In order to establish this defense, the defendant must establish a reasonable doubt as to the following: [¶] 1) The occupant actively invited the accused to enter, [¶] 2) At the time of consent, the occupant knew of the illegal and/or felonious intent of the defendant; [¶] 3) and that the defendant was aware that the occupant knew of his felonious intent, and the occupant did not contest or challenge the defendant's entry. [¶] Once established the People have the burden of proving that the defendant did not enter the residence with consent beyond a reasonable doubt. If the People have not met this burden, then you must find the defendant not guilty of this crime."

16

## B. Analysis

A trial court's evaluation of a motion for acquittal is governed by the same substantial evidence test used in an appellate challenge to the sufficiency of the evidence. The trial court determines "whether from the evidence then in the record, including reasonable inferences to be drawn therefrom, there is substantial evidence of every element of the offense charged." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 89.) The court must evaluate the evidence in the light most favorable to the prosecution. (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 132; *People v. Cole* (2004) 33 Cal.4th 1158, 1212.) If the record can reasonably support a finding of guilt, a motion for acquittal must be denied even if the record might also justify a contrary finding. (See *People v. Holt* (1997) 15 Cal.4th 619, 668.)

The offense of burglary is committed when a person enters a building with the intent to commit a theft or a felony. (§ 459.) However, a defense to a charge of burglary is available "when the owner *actively* invites the accused to enter, *knowing* the illegal, felonious intention in the mind of the invitee. [Citation.] But *the invitation by the owner to enter must be express and clear*; merely standing by or passively permitting the entry will not do. [Citation.] . . . [T]he owner-possessor must know the felonious intention of the invitee. There must be evidence 'of informed consent to enter *coupled* with the "visitor's" knowledge the occupant is aware of the felonious purpose and does not challenge it.' " (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1397-1398 (*Felix*), third italics added.) "[T]he burglary law is designed to protect a possessory right in property against intrusion and the risk of harm." (*People v. Superior Court (Granillo)* (1988) 205 Cal.App.3d 1478, 1485 (*Granillo*), citing *People v. Gauze* (1975) 15 Cal.3d 709, 713-715 (*Gauze*).) Lack of consent is not an element of burglary. (*People v. Sherow* (2011) 196 Cal.App.4th 1296, 1304; *Felix*, at p. 1397.) The burden of proof regarding the consent defense is on the defendant, because the exonerating facts establishing the consent defense are particularly within the knowledge of the defendant. (*Sherow*, at pp. 1304-

17

1305.)  But the defendant's burden is simply to raise a reasonable doubt as to the facts underlying the consent defense:  (1) whether an owner/possessor invited defendant to enter; (2) whether the owner/possessor knew of defendant's felonious intention; and (3) whether defendant knew the owner/possessor knew of defendant's felonious intent.  (*Id.* at pp. 1305-1309.)  As the *Felix* court explained, the invitation to enter must be express and clear.  (*Felix,* at p. 1398 [implied consent of defendant's sister to enter her home and take her property was insufficient to establish a consent defense to burglary].)

The trial court ruled that there was insufficient evidence of A.B.'s express invitation to warrant a directed acquittal under section 1118.1.  However, as defendant points out, A.B. testified that she expressly invited defendant to come into her bedroom through the window on the fourth visit and testified that she intended to "fulfill [her] promise" by having sex with defendant for the first time.  Additionally, in reference to the final occasion where defendant entered A.B.'s bedroom on the night of the kidnapping, A.B. testified that she opened her bedroom window to let him in.  Further, A.B. described all of defendant's other visits after the fourth visit as substantially the same as the fourth visit.  Accordingly, there was undisputed evidence establishing that A.B. expressly invited defendant into the home knowing his intent to engage in sexual activity with her.  However, as we discuss in detail *post*, more is required.

This case raises an issue not squarely addressed in published California case law: whether, for purposes of the consent defense to a burglary charge, a minor may consent to entry of her parent's home by someone who intends to engage in felonious sexual conduct with the minor.  While this case presents a novel question, we are not without guidance.

We begin with *Gauze*, *supra*, 15 Cal.3d 709, where presented with the question of whether a person can burglarize his or her own home, our high court discussed the common law underpinnings and statutory intent of section 459 and the concept of consent.  In *Gauze*, the defendant was charged with burglarizing his own apartment

18

where he lived with roommates when he entered the apartment with the felonious intent of shooting one of the roommates. (*Id.* at pp. 711-714.) The court noted that "section 459, while substantially changing common law burglary, has retained two important aspects of that crime. A burglary remains an entry which invades a possessory right in a building. And it still must be committed by a person who has no right to be in the building." (*Id.* at p. 714.) The court reasoned that the defendant invaded no possessory right of habitation. (*Ibid.*) Thus, the court concluded that the defendant could not be guilty of burglarizing his own home because he had "an absolute right to enter the apartment" and that right was not "conditioned on the consent of defendant's roommates." (*Ibid.*)

In reaching its conclusion, the *Gauze* court distinguished *People v. Sears* (1965) 62 Cal.2d 737. In *Sears*, a man who had been living in his wife's home but who was separated from her and living in a hotel was charged with the murder of his wife's daughter. The murder took place in his wife's home and the prosecution advanced a felony murder theory grounded on the theory that the defendant committed a burglary when he entered the home with the intent to assault his wife. (*Id.* at pp. 740-741.) The *Gauze* court reasoned that Sears was properly convicted of felony murder because "even if he had a right to enter, the right was based on former section 157 of the Civil Code [currently Fam. Code, § 753], which gave a person the right to enter the *separate* property of his or her spouse, subject to certain conditions. Thus Sears' 'right' to enter his wife's house . . . was at best conditional. An entry for anything but a legal purpose was a breach of his wife's possessory rights . . . ." (*Gauze, supra*, 15 Cal.3d at p. 715.)

The concept of consent in burglary cases was further refined in *Granillo, supra*, 205 Cal.App.3d 1478. There, the defendant was charged with burglary after entering an apartment upon the invitation of undercover police officers who set up a sting operation by inviting the defendant and others to enter the apartment in order to sell stolen goods to the officers. (*Id.* at pp. 1480-1481.) Fleshing out the consent defense, the Court of

19

Appeal noted that the occupant was fully aware of the defendant's felonious purpose in entering the apartment. (*Id*. at pp. 1484-1485.) The court also cited *Gauze* and explained that "the burglary law is designed to protect a possessory right in property against intrusion and the risk of harm. [Citation.] Granillo was not an intruder, nor did any danger to personal safety arise from his mere entry." (*Id.* at p. 1485.) Because the defendant entered the apartment with the officers' informed consent, the court concluded that to find him "guilty of burglary would be contrary to the primary basis of the burglary law." (*Ibid.*)

The rule was further evolved by this court in *People v. Salemme* (1992) 2 Cal.App.4th 775 (*Salemme*), in which the defendant entered a residence with the intent to sell the occupants fraudulent securities. (*Id*. at p. 777.) The *Salemne* court held, "since burglary is a breach of the occupant's possessory rights, a person who enters a structure enumerated in section 459 with the intent to commit a felony is guilty of burglary *except* when he or she (1) has an unconditional possessory right to enter as the occupant of that structure or (2) is invited in by the occupant who knows of and endorses the felonious intent." (*Id.* at p. 781.) Citing *Gauze*, the court reasoned that "a 'burglary remains *an entry which invades a possessory right in a building*. And it still must be committed by a person who has no right to be in the building.' [Citation.] [¶] A person has a right to be in a structure when he or she has an unconditional possessory right to enter (as in *Gauze* where the accused had the right to enter his own home, even for a felonious purpose) or where the person has expressly or impliedly[5] been invited to enter and does so for a lawful reason." (*Id.* at p. 779.)

---

[5] The *Salemme* court cited *Gauze* for the proposition that the invitation could be implied. (*Salemme*, *supra*, 2 Cal.App.4th at p. 780.) In discussing the notion of an implied invitation, however, our high court in *Gauze* spoke of an "implied invitation to enter a store during business hours *for legal purposes only*." (*Gauze*, *supra*, 15 Cal.3d at p. 713, italics added.) We emphasize that valid consent grounded on an invitation to enter for a

20

With this history of the consent defense in mind, we turn to cases involving minors.  In *In re Andrew I.* (1991) 230 Cal.App.3d 572 (*Andrew I.*), another minor, Scott, invited Andrew and a third minor to enter Scott's mother's home for the purpose of stealing her property.  (*Id.* at p. 577.)  Scott's mother testified that Scott had resided with her, but left the home one or two weeks prior to the burglary and had not returned.  (*Id.* at p. 576.)  While Andrew's felonious intent to steal was known to Scott and Scott helped him enter the home for that purpose, there is no indication that Scott's mother consented to Andrew entering her home for the purpose of committing a theft.  (*Ibid.*)  On appeal, Andrew challenged the burglary finding in his juvenile proceeding, contending that Scott had a possessory interest in the premises and invited Andrew to enter with knowledge of his felonious intent.  (*Id.* at p. 578.)  The Court of Appeal affirmed the burglary finding, first noting that Andrew lacked any possessory interest in or right to enter the premises.  (*Ibid.*)  The court then reasoned that Andrew could not invoke the consent defense because "Scott did not have an unconditional possessory interest in his mother's residence."  (*Id.* at p. 579.)  The court further reasoned that, separate from the fact Scott had left the home one or two weeks before the burglary, Scott did not "acquire a possessory interest simply because his mother had an obligation to support him.  'The parental obligation to provide for necessaries does not imply a possessory right in the parental residence. . . .  Financial support is all that is required by law.  No possessory right in a parental residence is implied by this duty of financial support.' "  (*Ibid.*, quoting *In re Richard M.* (1988) 205 Cal.App.3d 7, 15.)

Although outside the context of burglary case law, the California Supreme Court's analysis in *People v. Jacobs* (1987) 43 Cal.3d 472 (*Jacobs*) is also instructive.  There, the court analyzed the question of whether a minor may consent to a police search of her

_____

felonious purpose requires an invitation to enter that is "express and clear."  (*Felix*, *supra*, 23 Cal.App.4th at p. 1398.)

21

parents' home.  The court held that the 11-year-old child lacked authority to permit plain clothes police officers to enter and search the home while her parents were away.  (*Id.* at pp. 481-482.)  The court reasoned, "Minor children . . . do not have coequal dominion over the family home.  [Citation.]  Although parents may choose to grant their minor children joint access and mutual use of the home, parents normally retain control of the home as well as the power to rescind the authority they have given.  'It does not startle us that a parent's consent to a search of the living room in the absence of his minor child is given effect; but we should not allow the police to rely on the consent of the child to bind the parent.  The common sense of the matter is that the . . . parent has not surrendered his privacy of place in the living room to the discretion of the . . . child; rather, the latter [has] privacy of place there in the discretion of the former.'  [Citations.]"  (*Id.* at p. 482.)

In *Jacobs*, the court acknowledged that "[a]s a child advances in age she acquires greater discretion to admit visitors on her own authority.  In some circumstances, a teenager may possess sufficient authority to allow the police to enter and look about common areas."  (*Jacobs*, *supra*, 43 Cal.3d at p. 483.)  However, the court reasoned that "[a]n entry based on the unauthorized consent of an 11-year-old child . . . frustrates the objectives of [section 844].  It violates the privacy rights of the parents and increases the likelihood that an adult occupant will be startled by the apparently unauthorized intrusion and react violently out of concern for the safety of the child."  (*Ibid.*)  Accordingly, the Supreme Court clarified that a minor's authority over the family home derives from the parents' authority as the primary legal possessors.  (*Ibid.*)

Courts in several sister states have discussed a minor's purported consent to burglary.  We discuss two such cases because they illustrate circumstances showing both the minor's lack of authority to consent and the defendant's knowledge that the minor did not have authority to consent.

In a North Carolina case, *State v. Brown* (N.C.Ct.App. 2006) 626 S.E.2d 307 (*Brown*), the 45-year-old defendant engaged in a sexual relationship with a 13-year-old

girl he met online. The minor agreed to help sneak the defendant into her bedroom in her parents' home for the purpose of engaging in sexual acts. (*Id.* at pp. 310-311.) Defendant challenged his burglary conviction on appeal, contending there was insufficient evidence to support the conviction because the minor consented to his entry of her bedroom for the felonious purpose. (*Id.* at p. 312.) In North Carolina, the consent defense requires that the defendant show a good faith belief that he has the consent of the owner/occupant or his or her authorized agent to enter the premises. (*Ibid.*) The court held that the evidence did not support a consent defense, reasoning that "[a] child who has a room in his or her parents' house does not have unlimited authority to allow entry to visitors. [Citation.] Courts considering consent to entry given by a son or daughter have focused on the purpose of the entry and whether the child had authority to consent to entry for that purpose." (*Ibid.*) The court explained that the "[d]efendant's covert actions such as arriving late at night, wearing camouflage, signaling [the minor] with a red penlight, taking precautions about turning off lights, and hiding in [the minor's] closet all suggest that he did not believe [the minor] had full authority to allow him into her parents' house." (*Ibid.*; see also *State v. Tolley* (N.C.Ct.App. 1976) 226 S.E.2d 672, 674 [reasoning that that the defendant could not have reasonably believed that the child had authority to permit him to enter the home for the purpose of committing a felony].)

In an Indiana case, *Holman v. State* (Ind.Ct.App. 2004) 816 N.E.2d 78, a minor invited her adult boyfriend to enter her parents' home through her bedroom window. (*Id.* at pp. 80-81.) He was convicted of residential entry and contended on appeal that the evidence was insufficient to support his conviction because the minor consented to his entry into the home. (*Id.* at p. 81.) Like North Carolina, in Indiana, the consent defense requires that the defendant have a reasonable belief that he has permission to enter. (*Ibid.*) Further, the *Holman* court required that defendant have a reasonable belief that the minor had authority to give consent to enter. (*Id.* at p. 82.) The court held that the defendant should have known that the minor lacked authority to admit him: "on every

occasion that [the minor] had Holman over to her house, she did so surreptitiously without her parents' knowledge or permission."[6] (*Ibid.*)

Based on both our review of California case law and cases in sister states, we conclude that the consent defense is not applicable here. When the defendant does not have an unconditional possessory right to enter as an occupant of the premises, a defense of consent to enter the premises for the purposes of engaging in felonious sexual conduct with a minor requires one of the following: (1) the minor has a possessory interest in the premises coequal to the parent or other adult owner/occupant and expressly and clearly invited the defendant to enter so the defendant could engage in sexual conduct with the minor; or (2) a parent or other adult who has a possessory interest in the premises expressly and clearly gave the defendant permission to enter for the purpose of engaging in sexual conduct with the minor; or (3) the minor expressly and clearly gave the defendant permission to enter for the purpose of engaging in sexual conduct with the minor, the minor had been given permission by the parent or other person with a possessory interest to allow entry for such purpose, and defendant knew that the minor had been given such permission. Here, there is no evidence to support a consent defense under any theory.

There is no evidence that D.B. consented to defendant's conduct. There is no evidence in the record that A.B., a 13-year-old minor living in her mother's home, had authority to invite an adult man into the home for the purpose of having unlawful sexual

---

[6] Our discussion of cases from sister states where the law provides a consent defense when the defendant shows a good faith or reasonable belief he has been given permission and a reasonable belief the minor had authority to give permission should not be seen as an endorsement of a reasonable belief defense for burglary cases in our state. None of the California cases we have discussed involving the defense of consent in burglary cases permit the consent defense based on a mere good faith or reasonable belief that the person providing consent had the authority to do so and we do not extend the consent defense to such situations.

24

relations with her.  Indeed, there is evidence in the record suggesting that both A.B. and defendant *knew* that A.B. lacked authority to invite an adult male into her room.  Every aspect of defendant's encounters with A.B. was secretive and designed to prevent discovery by her mother.  A.B. specifically testified that she "knew that it wasn't right for an adult and a minor to be together."  She told defendant that she was worried her mother would find out about their relationship.  A.B. testified that this is why she and defendant agreed to have defendant sneak through her bedroom window late at night after D.B. was asleep.[7]  Additionally, A.B. hid the identity of defendant from D.B. by telling her that he was a 14 year old who skateboarded in the neighborhood.  And defendant's false statements to the police about not knowing who D.B. was and claiming he had never

---

[7]  As our state's Supreme Court reasoned in *Jacobs*, "[a]n entry based on the unauthorized consent of an 11-year-old child . . . violates the privacy rights of the parents and increases the likelihood that an adult occupant will be startled by the apparently unauthorized intrusion and react violently out of concern for the safety of the child." (*Jacobs*, *supra*, 43 Cal.3d at p. 483.)  While that analysis pertained to a minor's consent to police to enter the parents' home and the potential for violence is not *required* to negate a consent defense in a burglary case (*Salemme*, *supra*, 2 Cal.App.4th at pp. 777-778, 781-782), we note the potential for violence here.  A.B. testified, "I was scared that he was going to try to hurt me or pull a weapon on me."  She also testified during cross-examination that defendant had tried to force her to do something against her will at some point.  This indicates that there was a substantial risk of harm created by defendant's presence in the home without D.B.'s consent or authorization.  Apart from these circumstances, the prospect of defendant's discovery in the home by D.B. or A.B.'s grandmother and the events that might follow raised the real danger that violence might occur, whether it be a violent attack by the mother on defendant, a violent attack on the mother or the victim by defendant, or violence that might result if there was a confrontation with law enforcement.  The situation in this case is thus in sharp contrast to *Granillo*, where the defendant "was not an intruder, nor did any danger to personal safety arise from his mere entry." (*Granillo*, *supra*, 205 Cal.App.3d at p. 1485.)  Applying the consent defense here would also be at odds with *Gauze*.  As the *Gauze* court clarified, the burglary law is " 'primarily designed . . . not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to public safety.'  Section 459, in short, is aimed at the danger caused by the unauthorized entry itself." (*Gauze*, *supra*, 15 Cal.3d at p. 715.)  Here, defendant's entry created a real risk of harm or violence.

25

been to the house show that defendant knew that he did not have permission from D.B. to enter her home to have sex with her daughter and that A.B. did not have D.B.'s permission to allow him to enter for that purpose.

In his briefing on a related issue, defendant raises the valid point that "[n]ot everyone present on a premises need give consent for the 'consent' defense to apply"; however, D.B. was not merely "present" at the home. Rather, D.B. was the occupant with a possessory interest in the home and any authority A.B. had over the premises would have derived from her mother's possessory interest. Unlike, for example, a case where one of two or more adult roommates or one spouse provides consent to burglary without the other's knowledge,[8] minor children do not generally have a possessory interest in the home. Unlike the facts in *Gauze*, where the defendant had "an absolute right to enter the apartment" and that right was not "conditioned on the consent of defendant's roommates" (*Gauze*, *supra*, 15 Cal.3d at p. 714), a minor's authority over the premises is derivative. (See *Jacobs*, *supra*, 43 Cal.3d at p. 482 ["Minor children . . . do not have coequal dominion over the family home."]; *Andrew I.*, *supra*, 230 Cal.App.3d at p. 579 [" 'The parental obligation to provide for necessaries does not imply a possessory right in the parental residence.' "].)

We conclude that defendant invaded D.B.'s possessory interest in the home and the evidence did not show that A.B. had the authority to allow defendant into the home to engage in felonious sexual relations with her. Moreover, the evidence shows defendant

---

[8] We do not opine on whether the consent defense is applicable in these scenarios but note that such cases would present a potential distinction from the instant case and are closer to the facts in *Gauze*, *supra*, 15 Cal.3d at pages 711 through 714.

knew A.B. had no such authority. Accordingly, we conclude that the court did not err in denying defendant's motion for judgment of acquittal.[9]

### III. Prosecutor's Comment on the Consent Defense

### A. Background and Defendant's Contentions

During closing argument, the prosecutor argued that defendant's entry into the home "presented a dangerous situation to the people inside of the home. What if the defendant had been coming inside the home or what if he had been discovered by [D.B.] [and] in an attempt to getaway or free he hurt [D.B.]. I mean, it is not uncommon for someone whose [*sic*] interrupted during a first degree burglary in someone's home to hurt the homeowners. [¶] Those situations and dangers are present in this case, and that's why the defendant is guilty of the burglary, even though [A.B.] was letting him inside.

"[DEFENSE COUNSEL]: Objection, misstatement of the law.

"THE COURT: Overruled. Go ahead.

"[THE PROSECUTOR]: And finally regarding the burglary, when he entered to kidnap her on October 15th, 2010. You'll get the jury instruction that -- there again, the same dangers apply . . . ."

Defendant contends that the prosecutor engaged in misconduct by misstating the law on the consent defense and this misconduct prejudiced defendant. He argues that it was a misstatement to argue that A.B.'s permission to enter the home was not sufficient consent.

### B. Analysis

As discussed *ante*, " ' " '[a] prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects

---

[9] We note that while defendant nevertheless received the benefit of his special jury instruction on the consent defense (see fn. 4, *ante*), the jury also rejected his incorrect theory by convicting him on all burglary counts.

the trial with such unfairness as to make the conviction a denial of due process." ' " ' " (*Hill*, *supra*, 17 Cal.4th at p. 819.)  We conclude that the prosecutor did not misstate the law in such a way that it infected defendant's trial with unfairness.  Here, the prosecutor accurately summarized the concerns about the risk of harm raised in burglary case law and why that risk was present in this case as opposed to other cases where the consent defense has been successful like *Gauze* and *Granillo*.  (See fn. 7, *ante*.)  The reason consent tends to mitigate against the dangers created by burglary, and thereby provides a valid defense to burglary, is that the possessor with authority to consent already has knowledge of the alleged burglar's presence and felonious intent when the alleged burglar enters the home.  In other words, there is no element of surprise; there is no danger of violence.  While A.B. had this knowledge, her mother, as an adult and the primary possessor, certainly did *not* have knowledge of defendant's presence, much less his felonious intent.  Thus, the fundamental danger that section 459 was enacted to curb remained unmitigated by A.B.'s consent in this case.

The prosecutor accurately summarized the concerns underlying the burglary law and the trial court did not err in overruling the defense objection to the prosecutor's argument.  There was no misconduct.

## IV.  Cumulative Error

Defendant contends that the cumulative effect of the two alleged instances of prosecutorial misconduct warrants reversal.  We reject this contention.  The premise behind the cumulative error doctrine is that while a number of errors may be harmless taken individually, their cumulative effect requires reversal.  (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.)  Any of the potential errors identified above "were harmless, whether considered individually or collectively.  Defendant was entitled to a fair trial but not a perfect one.  [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  We have found no errors or prejudice when considering defendant's claims separately.  Viewed cumulatively, our conclusion is the same.  The evidence against

28

defendant was overwhelming, and he has failed to demonstrate prejudice.  Accordingly, defendant was not deprived of a fair trial.

## V.  Statutory Vagueness

### A.  Background and Defendant's Contentions

Prior to trial, defendant filed a motion to dismiss the section 288.3 counts under section 995.  Defendant contended that section 288.3, contact with a minor with intent to commit a sexual offense, violated his right to due process and is unconstitutionally vague.  The trial court heard argument on the motion and denied it, reasoning that section 288.3 "is clear, it does not punish speech, and one would reasonably know that it punishes the act of communicating with a minor intending to commit one of several specified sex offenses."

Subsequently, defendant filed a second non-statutory motion to dismiss the charges under section 288.3, again contending that the statute is unconstitutionally vague and also contending that it violates the First Amendment guarantees of free association and free speech.  The court denied defendant's motion, ruling that the statute is constitutional.

On appeal, defendant asserts that the language of section 288.3, subdivision (a), is "unconstitutionally vague" because it fails to define the terms " 'contact' " or " 'communicate.' "  According to defendant, "[a]s written, the statute requires law enforcement authorities to evaluate whether casual words, looks, glances, or smiles constitute contact or communication with a minor."  He claims that because the statute is vague, "section 288.3 permits complete discretion in law enforcement to determine whether and when an adult had contacted or communicated with a minor within the meaning of the statute."

### B.  Analysis

Section 288.3, which was adopted by the voters and effective November 8, 2006, provides in pertinent part:  "(a) Every person who contacts or communicates with a

29

minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit an offense specified in Section 207, 209, 261, 264.1, 273a, 286, 288, 288a, 288.2, 289, 311.1, 311.2, 311.4 or 311.11 involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense.  [¶]  (b) As used in this section, 'contacts or communicates with' shall include direct and indirect contact or communication that may be achieved personally or by use of an agent or agency, any print medium, any postal service, a common carrier or communication common carrier, any electronic communications system, or any telecommunications, wire, computer, or radio communications device or system."

As defendant acknowledges, in *People v. Keister* (2011) 198 Cal.App.4th 442 (*Keister*), this court squarely rejected defendant's argument.  The defendant in *Keister* likewise asserted that "section 288.3 is void for vagueness because it 'allows for the personal predilections of law enforcement officials to establish standards for what constitutes "contact with a child" and how the required intent is shown.'  [Defendant] claims that a glance, wink, or smile could suffice . . . ." (*Id.* at p. 448.)  The court disagreed, explaining that " '[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.'  [Citation.]  [¶] There is no such indeterminacy here.  The statute requires the defendant to contact or communicate with a minor or attempt to do so with the specific intent to commit an enumerated sex offense.  [Citation.]  Those are questions of fact.  Whether a defendant made the contact or communication and had the requisite intent are yes-or-no determinations, not subjective judgments.  'To be sure, it may be difficult in some cases to determine whether these clear requirements have been met.  "But courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary

30

human experience, mental condition may be inferred." ' [Citation.]" (*Id.* at p. 449.) We adhere to this court's analysis in *Keister* and conclude that section 288.3 is not constitutionally vague.

## VI. Statutory Overbreadth

Defendant contends that section 288.3, subdivision (a), violates the First Amendment because it is an overbroad, content-based regulation of free speech. He asserts that the statute is overbroad because it "bans any communication with a minor if made with the intent to commit a lewd act, or to commit any other offense listed in the statute, . . . even if it had nothing to do with the intended sex crime, so long as it was made with the intent to commit that crime in the future." He claims that "section 288.3 effectively prohibits potential child molesters from communicating with children at anytime, anywhere, and under virtually any circumstance. If a person is sexually attracted toward children, he violates the statute whenever he communicates with a child because he has the constant intent to molest if given the opportunity." Thus, according to defendant, section 288.3 is an overbroad content-based restriction of free speech that fails under strict scrutiny.

Statutes are presumed constitutional and should be construed to uphold their constitutionality unless the opposite " 'clearly, positively and unmistakably appears.' " (*In re Dennis M.* (1969) 70 Cal.2d 444, 453.)

"A statute may not be found constitutionally invalid on overbreadth grounds simply because it is possible to conceive of one or a few impermissible applications; such invalidity occurs only if the provision inhibits a substantial amount of protected speech." (*People v. Toledo* (2001) 26 Cal.4th 221, 234-235.) "Where the statute in question is narrowly drawn to protect a legitimate state interest, and proscribes conduct and not purely speech, the overbreadth of the statute 'must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' [Citation.]" (*People v. Hernandez* (1991) 231 Cal.App.3d 1376, 1381.) "In order to successfully challenge a

statute as overbroad, a party 'must demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the [statute] cannot be applied constitutionally.' [Citation.] '[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.' [Citation.]" (*Id.* at pp. 1382, 1379.)

This court considered defendant's argument in *Keister* and rejected it, explaining, "Defendant is wrong on his factual assertion and on his legal conclusion. [¶] His factual assertion—a person who is sexually attracted to children violates section 288.3 anytime he communicates with a child—is not true. The only time the communication is criminal is if it is motivated by a specific intent to commit an enumerated sex crime. [Citation.] [¶] While there is a limit on free speech to the extent that section 288.3 criminalizes otherwise protected communications with a minor, the statute has been written in a way that does not unconstitutionally restrict protected speech. Before the statute is violated, the defendant must know or reasonably should have known the other person was a minor, have the specific intent to commit an enumerated sex offense, and then contact or communicate with that minor or attempt to do so. [Citation.] Thus, without the unlawful sexual intent, the statute is not violated." (*Keister*, *supra*, 198 Cal.App.4th at pp. 449-450.)

Again, we adhere to this court's analysis in *Keister* and conclude that section 288.3 is not unconstitutionally overbroad.

## VII. Section 667.8 Enhancement

Defendant contends, and the People concede, that the fifteen-year enhancement related to Count 2, imposed under section 667.8, subdivision (b), must be stayed because the sentence on the underlying offense was stayed pursuant to section 654. We agree. "[F]ailure to stay an enhancement, where the base term to which it is added is stayed, and requiring that time be served only for the enhancement has the effect of elevating the enhancement to the status of an offense. Enhancements are not offenses, they are

32

punishments. [Citation.]" (*People v. Guilford* (1984) 151 Cal.App.3d 406, 412; accord, *People v. Smith* (1985) 163 Cal.App.3d 908, 914 ["[O]ne cannot be punished for the enhancement separately from the underlying offense."]; *People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709 ["Where the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed."], disapproved on another ground in *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130, fn. 8.) Accordingly, the fifteen-year sentence on the enhancement related to Count 2 must be stayed pursuant to section 654.

### DISPOSITION

The judgment is modified to stay execution of the sentence for the section 667.8, subdivision (b), enhancement imposed on Count 2. The trial court is directed to amend the abstract of judgment in accordance with this opinion and forward the amended abstract to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.


                                                                      MURRAY            , J.


We concur:


      NICHOLSON       , Acting P. J.


      MAURO          , J.

33