[No. G013002. Fourth Dist., Div. Three. Mar. 29, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK ANTHONY FELIX, Defendant and Appellant.

[No. G014705. Fourth Dist., Div. Three. Mar. 29, 1994.]

In re MARK ANTHONY FELIX on Habeas Corpus.

COUNSEL

Howard J. Stechel, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, Warren Robinson and Esteban Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SILLS, P. J.—Mark Anthony Felix was convicted of two counts of residential burglary by a jury. The court found he had four prior serious felony convictions and sentenced him to serve twenty-five years and four months in prison. He contends evidence that he was a heroin user was improperly admitted and that the prosecutor prejudicially commented on his addiction. He also argues the court failed to instruct sua sponte that he was not guilty of burglary of his sister's home because she implicitly consented to his entering her home and taking whatever he wanted.[1] In a consolidated action, he petitions us for a writ of habeas corpus claiming he was denied effective

---

[1] We granted Felix permission to challenge the constitutionality of the standard "reasonable doubt" instruction found in CALJIC No. 2.90 as a result of the United States Supreme Court's grant of certiorari in *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d

representation of counsel because his attorney failed to object to the evidence of his heroin use. Although trial counsel also used the drug evidence to support a defense to the burglary charge, she provided Felix with a declaration after conviction to the effect she failed to object to the prosecutor's evidence out of ignorance. Concluding this type of Monday morning quarterbacking should not result in a touchdown nunc pro tunc, we deny his petition and affirm the judgment.

# I

## FACTS

On January 2, 1992, Beatrice Gutierrez left her home in Santa Ana with her child, locking the door as she left. When she returned, the place was in disarray. Several items were missing: the video-cassette recorder (VCR), the compact disc (CD) player, a black leather jacket, a Nintendo game and her wedding ring. She also noticed that the sliding glass door was ajar. She promptly reported the crime to the police, telling them no one had permission to enter her home while she was gone.[2] The police lifted a latent fingerprint from an open soda can on the counter. The print matched one of Felix's—Beatrice's brother.

On January 27, 1992, Daniel Garza left his apartment for work. Upon his return that evening, he found the sliding glass door open and the doorpost scratched. His microwave, telephone, watch, some food and clothes were missing. He called the police and reported the burglary; they had him identify his property and then returned all but his watch.

Around noon on the same day, Santa Ana Police Officer Julio Jaramillo saw Felix pushing a grocery cart laden with nongrocery items. Knowing Felix was wanted for the burglary of Beatrice's home, Jaramillo wheeled his car around as Felix abandoned his cart and ran. Jaramillo gave chase, apprehending him a short distance away. Jaramillo's partner retrieved the cart laden with a microwave, telephone, food and clothes, all items owned by Garza.

---

862] (cert. granted Sept. 28, 1993, __ U.S. __ [125 L.Ed.2d 789, 114 S.Ct. 40]). He won the battle but lost the war because the instruction was upheld by the United States Supreme Court. (*Victor* v. *Nebraska* (1994) __ U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239] [consolidated with *Sandoval* v. *California* (1993) __ U.S. __ (125 L.Ed.2d 789, 114 S.Ct. 40)].)

[2]The investigating officer was concerned when he noted there was no evidence of forced entry on the sliding glass door, or anywhere else in the house. He questioned Beatrice about anyone else having a key or access to the place. Beatrice assured him that no one else had permission to be there when she was gone.

Officer Brian Zell interviewed Felix for about an hour after advising him of his *Miranda*[3] rights and obtaining the requisite waiver. Zell began the interview by asking Felix questions about the burglary at Beatrice's house. At first, Felix denied even being at his sister's house since Thanksgiving, saying he sometimes lived with his mother on the same block as Garza and would occasionally visit his sister. When Zell showed him the match between his fingerprint and that found on the soda can, he admitted he had lied to them saying, "[I] can't deny that shit. I was hoping to try to talk to [his sister and brother-in-law]. I guess it's too late for that now." He admitted he burglarized her home on January 2, after entering through a back window when he knew she was at work. Zell asked him if he could recover any of the items, but he could not as he had already sold them. Zell asked him why he did it; did he do it to get money to buy drugs? He admitted receiving about $90 for the items to buy heroin.

Although he discussed the burglary of his sister's place, he refused to discuss the burglary of the Garza house. However, the items in the abandoned grocery cart, which he was pushing when first spotted by the police, were identified as those taken from Garza's residence that same day.[4]

At the time of the investigation, Beatrice told the police no one had permission to enter her home that day. After the fingerprint analysis showed the burglar was her brother, Beatrice told the police her *mother* had a key to her place, but that her brother did *not* have permission to be in her home when she was gone.

At trial, Beatrice's testimony—as well as her husband's—contradicted those earlier statements. She testified any member of her family—Felix included—had her permission to *take* any of her things at any time, although this would make her mad. She knew Felix occasionally lived with her mother who had a key to Beatrice's place, and she had lent them her VCR in the past. She had also let Felix wear her husband's leather jacket on two occasions.

On cross-examination, however, she had difficulty explaining some of the discrepancies between her earlier statements and her direct testimony. For example, in response to direct examination, she testified she had lent her mother and brother her VCR in the past. But to do this, they had always telephoned her first and then come by in her mother's car to pick it up. They

---

[3]See *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 160, 210 A.L.R.3d 974].

[4]Garza returned to his home a few hours *after* Felix's arrest. Thus, the officers did not know the property belonged to Garza until he identified it that evening.

had never entered her home while she was gone and taken it without notice. And she had never given him permission to use—much less take—either the CD player or her wedding ring. She tried to explain why she told the officers no one had permission to enter; she thought a *stranger* had burglarized her home. But she could not explain why, on learning the fingerprints on the soda can were her brother's, she continued to insist her brother did *not* have permission to be there, while at trial she was insisting he did. Finally, Beatrice conceded no one had ever given Felix *express* permission to come and take whatever he wanted; it was merely a silent family understanding.

## Discussion

## II

### *Admission of the Evidence of Heroin Use*

■ Felix complains on appeal that the trial court improperly admitted evidence of his heroin use. The evidence was presented in two ways: (1) through the cross-examination testimony of Beatrice who conceded she was distressed at the time of the burglary by her brother's heroin problem, and felt he needed treatment; and (2) through Detective Zell's testimony about the interview with Felix in which Felix said the reason he burglarized his sister's place was to steal something, and buy heroin with the proceeds from its sale. Felix opines the evidence is inherently prejudicial and so inflammatory in nature that any jury would convict anyone of anything once it knew the person was a drug user. He argues evidence of narcotics use is "uniformly held to be inadmissible." Furthermore, because his counsel failed to object to any of this testimony, he petitions for a writ of habeas corpus based on ineffective assistance of counsel.

### A. *The Admission of the Heroin Use*

Evidence that Felix was a narcotics user was admitted to prove his motive for burglarizing his sister's home.[5] This evidence was established by his own words explaining his reasons for committing this particular burglary. "The rule applicable [to such evidence] is that evidence of an accused's narcotics addiction is inadmissible where it 'tends only *remotely* or *to an insignificant degree* to prove a material fact in the case . . . .' [Citation.]" (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 906 [184 Cal.Rptr. 165, 647 P.2d 569], italics added.)

[5]Evidence Code section 1101, subdivision (b) permits "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, . . .) other than his or her disposition to commit such an act."

In each of the cases cited and relied on by Felix, evidence of narcotics use was unconnected to the crime in question. In *Cardenas*, the robbery suspect was arrested five days after the crime and had multiple alibi witnesses. Even so, the prosecutor presented evidence through the arresting officer that Cardenas was under the influence of narcotics at the time of the arrest to show he had a motive to commit the robbery. The prosecution failed to show there was any connection between the *charged* crime and the use of narcotics. It preferred to leave that conclusion to the jury to draw simply because *Cardenas* used narcotics, a serious problem which the public "has been taught to loathe . . . ." (31 Cal.3d at p. 907; see also, *People* v. *Forte* (1988) 204 Cal.App.3d 1317, 1324, fn. 4 [251 Cal.Rptr. 855] [improper to admit officer's opinion that defendant was addicted to narcotics in burglary case even though codefendant allegedly approached defendant for help in the crime because *codefendant* needed money to buy drugs].)

Likewise, in *People* v. *Davis* (1965) 233 Cal.App.2d 156 [43 Cal.Rptr. 357], a robbery conviction was reversed after the arresting officer testified that, in his opinion, Davis was under the influence of narcotics when arrested a week after the robbery. Davis responded to this allegation by presenting evidence he was employed, making $71 a week and lived at home with his mother. As the appellate court noted, any connection between narcotics use—assuming the officer was right—and the robbery the week before was "tenuous at best." It required two assumptions: (1) Davis was using *expensive* drugs—heroin in contrast to marijuana—and (2) he was addicted to those expensive drugs, resulting in his entering a regular life of crime to support that addiction. No evidence existed to support either assumption. Instead, the "prosecution branded him as a habitual lawbreaker, a loathsome, unworthy person, predisposed to rob or steal to support his habit" which Davis "was unprepared to meet except by his own denial . . . ." (*Id.* at p. 162.)

In *People* v. *Bartlett* (1967) 256 Cal.App.2d 787 [64 Cal.Rptr. 503], a burglary conviction was reversed when the arresting officer opined Bartlett was under the influence of narcotics at the time of his arrest. The evidence convicting him of the theft of the spark plugs was strictly circumstantial: Bartlett and friends drove into a garage and after they drove away, the garage owner determined some boxes of spark plugs were missing. Bartlett was arrested about a week later. The evidence of his "withdrawal" symptoms a week after the crime was too remote to overcome the prejudicial impact the abuse of heroin could have on a jury. Narcotics use must have a *direct* probative value to establish motive before its admission is permitted.

That is what the trial court had here. Felix told Zell the reason he burglarized his sister's home on January 2 was to sell the items and buy

drugs. The direct connection was established by his own statements, not by the opinion of an officer based on observations on an unrelated occasion. This is the classic example of direct probative evidence establishing motive which each of the above cases did *not* have. The admission of evidence of motive was not error; such evidence is "inadmissible where it 'tends only remotely or to an insignificant degree to prove a material fact . . . .' " (*People* v. *Cardenas, supra,* 31 Cal.3d at p. 906.) Here, it directly proved the material fact.

### B. *Failure to Object to Evidence of Motive*

██ In his petition for writ of habeas corpus and this consolidated appeal, Felix argues his trial counsel was incompetent and failed to represent him effectively for failing to object to the evidence of his motive for burglarizing his sister's house. In his petition, he attaches a declaration by his trial counsel apologizing that she "did not know evidence of defendant's narcotics use [was] inadmissible." However, in her final argument, she advocated that Felix's drug use affected his ability to formulate the specific intent required in the crime of burglary, a valid defense to the charge if believed by the jury. And she presented testimony that the family distress over Felix's drug use caused Beatrice to lose her temper and report a burglary when she—allegedly—implicitly permitted Felix to enter her home whenever he wanted. Concluding such evidence was "clearly inadmissible," Felix describes his attorney's failure to object resulted in "catastrophic" consequences, denying him a fair trial when the "evidence was far from overwhelming." We disagree.

██ "Familiar principles govern our review of this issue. The burden of proving a claim of inadequate trial assistance is on the appellant. [Citation.] He must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Additionally, he must establish prejudice, i.e., a reasonable probability that absent counsel's unprofessional errors the result would have been different, before he can obtain relief. [Citations.] Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. [Citations.]" (*People* v. *Thomas* (1992) 2 Cal.4th 489, 530-531 [7 Cal.Rptr.2d 199, 828 P.2d 101]; internal quotation marks omitted.) ██ Moreover, when no error occurred, "defense counsel was not ineffective in making no objection." (*Id.* at p. 531; *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1173 [9 Cal.Rptr.2d 834, 832 P.2d 146] ["Defense counsel is not required to advance

unmeritorious arguments on the defendant's behalf."].) Finally, a "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250]; see *People* v. *Thomas, supra,* 2 Cal.4th at p. 531.)

Because the evidence of narcotics use as Felix's motive for burglarizing his sister's home was *not* inadmissible, counsel's failure to object was not ineffective representation. However, once the prosecutor argued that Felix's drug abuse problem was a motive for the *Garza* burglary, as well as the Gutierrez charge, we have a different problem. No evidence established a direct connection between the addiction and the later burglary, although Felix's statement to Zell provided that nexus for the Gutierrez burglary. Thus, it was error for the prosecutor to draw this conclusion—that it also applied to the *Garza* crime—and argue it. (*People* v. *Cardenas, supra,* 31 Cal.3d at p. 906.) However, in the face of overwhelming evidence of guilt—(1) Felix pushing a cart with the fruits of the burglary in the same neighborhood in which he *and* Garza lived; (2) Felix possessing these fruits within moments of when the burglary occurred; (3) Felix fleeing from the scene and abandoning the fruits as soon as he saw the officers; and (4) Felix confessing to an almost identical burglary three weeks before in which he took similar items and in a similar manner—we cannot say a different result would have resulted but for counsel's failure to object to this one argument by the prosecutor. (E.g., *People* v. *Ghent, supra,* 43 Cal.3d at pp. 772-773.)

Felix argues to the contrary. He contends the evidence was "open to serious doubt of guilt." Such a contention requires us to completely eliminate any consideration of Zell's testimony regarding Felix's statements. This we cannot do; determinations of weight to be accorded the testimony of witnesses rest within the purview of the trier of fact which we must uphold if supported by substantial evidence. (*People* v. *Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

Felix repeatedly exhorts us that he was *entitled* to "stand before the jury presumptively innocent and of good character [and that, in] characterizing him as a narcotics user, a charge he was unprepared to meet except by his own denial, the prosecution branded him as an habitual lawbreaker, a loathsome, unworthy person, predisposed to rob or steal to support his habit. [And that he] is entitled to have the conflicting evidence reweighed without that kind of handicap. . . ." (*People* v. *Davis, supra* , 233 Cal.App.2d at p. 162.) We are somewhat amazed at his audacity. Of course he stood before the jury presumptively innocent. But that does *not* entitle him to bar admission of relevant evidence which proves his guilt of the charge. It only entitles him to object to evidence which is either *irrelevant* or *unduly*

prejudicial. The need to correct his misconception of the latter term leads us to quote the distinction between *undue* prejudice and probative evidence: "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is prejudicial. The prejudice referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, prejudicial is not synonymous with damaging. [Citation.]" (*People* v. *Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189], internal quotation marks omitted.) In other words, Felix is *not* entitled to stand before the jury and knowingly deceive it on relevant issues, such as the reason for his commission of the crime when that explanation is neither remote nor insignificant.

■ To complete this argument, Felix contends the court committed error by failing to instruct sua sponte that the evidence of motive was limited to the Gutierrez burglary. But there is no duty to instruct sua sponte on the limitation of evidence (*People* v. *Collie* (1981) 30 Cal.3d 43, 63-64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]), and it is quite speculative to conclude a different result would have occurred had Felix's trial counsel requested that instruction.[6] (Cf. *People* v. *Wrest* (1992) 3 Cal.4th 1088, 1116 [13 Cal.Rptr.2d 511, 839 P.2d 1020].)

### III

### *Jury Instructions*

### *Sua Sponte Instruction of Consent as Defense*

■ Felix complains the trial court erred by failing to instruct the jury sua sponte that his sister's consent to his taking her property constituted a defense to the burglary charge. In the alternative, he argues that if a sua sponte duty does not exist, his trial counsel was incompetent for failing to draft and request such a specific instruction. We reject both arguments.

The defense argued Felix had "silent" permission to enter and take the Gutierrez's property, although he was never expressly told that until long after the event had taken place. The defense then attacked Zell's testimony regarding Felix's confession because he had failed to tape-record it, contending it never happened. Without Felix's confession to burglary—so the argument goes—there was no evidence of his intent to steal because none of

---

[6] It should be noted that the limiting instruction—CALJIC No. 2.09—was originally requested *but then withdrawn* by defense counsel.

the stolen items was ever found. In the alternative, defense counsel argues Felix entered his sister's place with her implicit permission, and once there, decided to take some of her things, negating the possibility he had the requisite intent at the time of entry. The trial court instructed the jury on the elements of burglary[7] and grand theft (theft by larceny).[8] No instruction was given stating that the victim's consent—express or implied, anticipatory or after-the-fact—constituted a defense to the charge of burglary.

A burglary charge requires evidence the accused entered the residence with the specific intent to steal, take and carry away the personal property of another of any value and with the specific intent to deprive the owner permanently of such property. (Pen. Code, § 459.) Lack of consent—*by itself*—is *not* an element of the offense. (See 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Without Consent, § 662, pp. 743-744.) The reason is quite simple: if lack of consent were an element of the offense, no one could be prosecuted for burglarizing a business during store hours. (*People* v. *Barry* (1892) 94 Cal. 481, 483 [29 P. 1026].) The question in this case, however, is the converse of this rule: does an implicit, after-the-fact consent constitute an automatic defense to the charge of burglary? We answer this in the negative and, therefore, no sua sponte instruction was required.

There are occasions when consent given by the owner of the property will constitute a defense to a burglary charge. For instance, when the accused *is* the owner of the property (*People* v. *Gauze* (1975) 15 Cal.3d 709, 714 [125 Cal.Rptr. 773, 542 P.2d 1365]),[9] or when the owner *actively* invites the accused to enter, *knowing* the illegal, felonious intention in

---

[7]The court directed the jury that the elements of burglary are "(1) A person entered a residence; [¶] (2) At the time of entry, such person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of such property." (CALJIC No. 14.50, as given.)

[8]The court told the jury "[e]very person who steals, takes, carries, leads or drives away the personal property of another with the specific intent to deprive the owner permanently of his property is guilty of the crime of theft by larceny in violation of Penal Code, section 487. . . ." (CALJIC No. 14.02, as given.)

[9]In *Gauze*, two roommates argued while visiting a friend. Gauze told his roommate to get his gun because he also intended to get his. This he did and when he returned home, he shot his roommate. To determine if a resident could commit a burglary, the court centered on the similarities and differences between common law burglary and the codification of the crime in California. The court concluded an owner could enter his own home—even for a felonious purpose—whenever he desired because the burglary statute was "based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. . . ." (*Peoople* v. *Gauze, supra*, 15 Cal.3d at pp. 715-716.)

the mind of the invitee. (*People* v. *Superior Court* (*Granillo*) (1988) 205 Cal.App.3d 1478, 1485 [253 Cal.Rptr. 316] [". . . the burglary law is designed to protect a possessory right in property against intrusion and the risk of harm" so an undercover officer cannot invite a potential buyer of stolen property into his warehouse of stolen goods, devised as a front to catch would-be buyers, and then prosecute the buyer for burglary.]) But the invitation by the owner to enter must be express and clear; merely standing by or passively permitting the entry will not do. (E.g., *People* v. *Thomas* (1977) 74 Cal.App.3d 320, 322-323 [141 Cal.Rptr. 340] [if owner of store actually hired Thomas to enter the store, remove certain items which Thomas suspected were stolen and spirit them away for "safekeeping," a defense to the burglary charge was established].) And under either situation, the owner-possessor must know the felonious intention of the invitee. There must be evidence "of informed consent to enter *coupled* with the 'visitor's' knowledge the occupant is aware of the felonious purpose and does not challenge it." (*Granillo, supra,* 205 Cal.App.3d at p. 1486, italics added.)

This last point is crucial. The occupant must know the person he is inviting into the home intends to interfere with his possessory rights; and the invitee must be able to show the occupant possesses this knowledge. Otherwise, a business could never be burglarized by an employee, nor could a business open to the public ever be burglarized. (*People* v. *Deptula* (1962) 58 Cal.2d 225, 226-228 [23 Cal.Rptr. 366, 373 P.2d 430] [manager of bowling alley burglarized the premises when he stole from the commercial safe, even though he had the keys to the business and had permission to be there at any time].) The invitee's illegal purpose negates the occupant's express permission.

For example, burglary can occur when a salesman enters a private home intending to sell fraudulent securities. (E.g., *People* v. *Salemme* (1992) 2 Cal.App.4th 775, 777-778 [3 Cal.Rptr.2d 398].) Or, as we held in *In re Andrew I.* (1991) 230 Cal.App.3d 572 [281 Cal.Rptr. 570], burglary occurs even if the burglar enters with the owner's consent, " 'provided he [or she] does not have an unconditional possessory right to enter.' " (*Id.* at p. 578.) The facts in *Andrew* are illustrative.

Andrew entered the home of a friend's mother after Andrew and his friend decided to steal some of the friend's mother's property. The friend had run away from home a week or so before, leaving some of his clothes behind. When he and Andrew decided to retrieve the clothes, they also planned to help themselves to a few other things as well. As we said, "Andrew clearly had no possessory interest in or right to enter the victims' residence. The mere fact [his friend] invited him inside is not, alone, sufficient to preclude

a burglary conviction." (*In re Andrew I., supra,* 230 Cal.App.3d at p. 578.) The crux of the matter is not that someone may or may not have given him an invitation to enter. "Permission to enter, whether express or implied, does not confer upon the entrant an unconditional possessory interest in the premises. These two concepts are not synonymous." (*Id.* at p. 579.) Even if the friend's mother had a legal obligation to support him, this did not confer a possessory interest to him in *her* things, which, obviously, meant Andrew had no possessory interest conferred on him by the friend. (*Ibid.*)

In a similar case, Richard M. escaped from a youth facility and after being refused entry by his stepmother, broke into her apartment and stole some food, a sleeping bag, and a folding mattress. He contended he was not guilty of burglary although he knew his father and stepmother had refused to permit him to enter their apartment. He maintained they owed a duty to support him with the necessities of life which conferred a possessory interest on him for such things. (See Pen. Code, § 270; Welf. & Inst. Code, § 903, subd. (a); Civ. Code, former §§ 196, 242.) Noting that "[p]roof of a bona fide belief, even if mistakenly held, that one has such a claim to property taken, negates the required element of felonious intent[,]" the court rejected Richard's contention as unreasonable—and therefore not a bona fide belief —because *he* knew his stepmother had told him he could not have anything. (*In re Richard M.* (1988) 205 Cal.App.3d 7, 13 [252 Cal.Rptr. 36].) It was his knowledge of the *occupant's* sole possessory interest at the time of the entry that was crucial.

Likewise, here. At the time Felix entered Beatrice's place, he *knew* he did not have her permission to be there or interfere with her possessory interest. His statement to the police proved that fact, as did Beatrice's original statement to the police. Even Beatrice's trial testimony conceded that there was only a silent family *understanding* that any of them could come and go from her home at will. She testified that she never expressly told Felix he could enter her home while she was gone. Thus, the express consent of an occupant, requiring evidence of an explicit invitation or order, was not present (assuming we accept Beatrice's testimony as true). But more importantly, *Felix* knew he had no possessory interest in the items, and *he knew Beatrice was ignorant—at the time he entered the house—of his plan to steal her things.* He admitted this when confessing to Zell because he said he had hoped to talk to them about what he did, but it was too late once he was arrested. Assuming Beatrice's testimony was correct and that she decided— after the fact—he could take whatever he wanted, it was not her state of mind that was pivotal; it was Felix's. And he told Zell he entered to steal the things to buy heroin. The elements of defense to the burglary charge were not met even if we accept Beatrice's testimony of consent as true. Without

some credible evidence of each element of the defense, the court has no sua sponte duty to instruct on it. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1].)

 Last, but not least, counsel failed to request a pinpoint instruction on her crafted defense of implicit consent. In a declaration signed after her client was convicted, she avers her failure was not due to any tactical consideration, just as there was no tactical reason she failed to object to the drug-use evidence. But such postconviction assertions are not necessarily controlling. The record shows trial counsel employed the evidence of Felix's drug use in a most reasonable way: as proof that he did not have the requisite specific intent for the burglary charge. Under these circumstances, the failure to request a pinpoint instruction was not necessarily incompetence. We are not unmindful of the pressures on trial counsel to "fall on her sword" once her client is convicted. But, as we related above, the evidence failed to meet the prerequisites of the crafted defense even when taken in the light most advantageous to it. Counsel's mere failure to draft an irrelevant instruction is thus insufficient—in and of itself—to meet the burden imposed on a defendant contesting trial counsel's competence. The showing Felix must meet is whether it is "reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 288 [266 Cal.Rptr. 834, 786 P.2d 892].) Even if an instruction had been given, the evidence was just not there to support a defense to the charge. Counsel is not required to make meritless motions or arguments. (*People* v. *Weston* (1981) 114 Cal.App.3d 764, 780 [170 Cal.Rptr. 856].)

The petition is denied; the judgment is affirmed.

Sonenshine, J., and Crosby, J., concurred.