STEWART, J.
*213 Defendant Pedro G. Garcia, while staying as a guest in his sister-in-law's home, forcibly raped and sodomized his 12-year-old niece, who was also his sister-in-law's guest and family member. He was convicted by a jury of forcible sex crimes, including a forcible lewd act against a child under the age of 14 in the course of a first *914 degree burglary. The burglary finding led to a statutorily mandated sentence of life without parole under the "One Strike" law and is at the crux of many of defendant's challenges. His principal argument is that the burglary finding cannot stand because he was *214 an invited overnight guest in the home and bedroom where he forced himself on his young niece. The law, however, is to the contrary.
At first blush, defendant's argument has some appeal since we commonly associate burglary with strangers breaking and entering a home and not with acts by invited guests. But our burglary statute, Penal Code section 459,[1] reaches beyond this common understanding to punish any entry into a home or a room within a home, so long as the person enters with the intent to commit a felony and without the authority to do so. Our case law confirms the statute's broad reach. Defendant contends this should not be the case because it is less heinous and less dangerous to commit a crime in a room of a home in which one is an overnight invitee than to commit the same crime after breaking and entering the home. Even if this were so, we would be bound by the statutory definition. But defendant's premise is also false, and demonstrates the wisdom behind the broad reach of our burglary law.
Our homes are sanctuaries, places of refuge and safety. When we invite another into our home, we trust him not to harm us or those who reside with or visit us there. The trust we repose in an invitee renders us, our family members and guests particularly vulnerable. Unlike the intruder, our invitee's presence does not engender fear, and we therefore are not on guard or prepared to protect against him. Precisely because we expect to be safe in our homes and with our invited guests, an invitee who preys on someone within our home is as dangerous and as heinous as the burglar who intrudes by picking the lock or climbing in the window. Defendant's argument that his conduct is less menacing and less blameworthy than that of the common burglar is ultimately unpersuasive. His conduct was at least as heinous and dangerous as that of an invading stranger.
Defendant makes several other arguments, including that the trial court committed prejudicial error in instructing the jury on burglary and in admitting evidence of uncharged prior sex offenses he was alleged to have committed against his niece, Jane Doe I, and another child to whom he was closely related; improperly ordered him to pay Jane Doe I $75,000 in restitution; and imposed a sentence that violates the constitutional prohibition against cruel and unusual punishment. We conclude all of his arguments lack merit. Therefore, we affirm the judgment.
BACKGROUND
In July 2013, a trial was commenced against defendant on three felony counts brought by the Contra Costa District Attorney regarding his sexual *215 conduct on April 17, 2011, with Jane Doe I: aggravated rape of a child under the age of 14 and 7 or more years younger than defendant (§ 269, subd. (a)(1); count one); aggravated sodomy of a child under the age of 14 and 7 or more years younger than defendant (id. , subd. (a)(3); count two); and commission of a forcible lewd act upon and with the body of a child under the age of 14 (§ 288, subd. (b)(1); count five). Count five was accompanied by certain allegations, including the special circumstance allegation that defendant committed this forcible lewd act during the commission of a first degree burglary, exposing him to a sentence of life without the possibility of parole. *915 (§ 667.61, subds. (c)(4), (d)(4) & (j)(1); § 460, subd. (a).). The record indicates defendant was 47 years old at the time of the alleged incidents.
I.
The Prosecution's Case
A. Jane Doe I's Recorded Interview
On April 28, 2011, 11 days after the incident, Jane Doe I spoke with a forensic interviewer at the Children's Interview Center (CIC) in Martinez in a video-recorded interview.[2] A portion of this recording was admitted into evidence and played for the jury.
Jane Doe I told the interviewer that she was getting ready for a baby shower in an aunt's room when her uncle came into the room through an open door, closed the door and locked it. He pushed her to a bed, took off her belt and pulled down her pants almost to her knees; she had nothing on underneath. He unzipped his pants and took out his "bird." He got on top of her and "started raping" her, putting his "part" in her repeatedly, and kissing her, and she saw something white come out of his part. She tried to push him off but could not. Her aunt came to the door and knocked. When there was no answer, the aunt was able to push the poorly closed room door open and came into the room after her uncle had gotten off of her. He left the room. Her aunt told Jane Doe I she needed to talk to her.
B. Jane Doe I's Trial Testimony
Jane Doe I, who was 14 at the time of trial, testified that a little more than two years earlier, on April 17, 2011, she was at the house of her aunt, *216 Esmeralda, preparing to attend a baby shower taking place next door. She was in a room of Esmeralda's house fixing her hair, with the room's door halfway open, when defendant came into the room. He was Jane Doe I's uncle by marriage to another aunt. He asked her if she had seen his son, Junior, and she said she had not. He left the room, but returned about 10 seconds later and "just started looking around if nobody was coming." He "touched [her] and stuff like that."
Jane Doe I further testified that defendant pushed her down onto a bed, pulled her pants and underwear down and began touching her legs. He then pulled down his own pants and underwear, laid down on the bed and put his penis into her vagina. Jane Doe I tried to push defendant off her with her legs, but he was too strong. He told her, "Tell it to nobody."
About five minutes after he attacked her, Jane Doe I testified, she heard Esmeralda outside the room. Defendant left the room. Jane Doe I's underwear and pants were still down by her knees when Esmeralda entered the room. Jane Doe I ran into another aunt's room. Esmeralda followed and asked her what had happened. Jane Doe I talked with her for about 10 or 15 minutes. Esmeralda told her to call her mother. The two then went next door to the baby shower.
Jane Doe I was asked at trial, "Prior to the day of the baby shower, had [defendant] ever done anything like this to you before?" She said "he did" every time she went to his home in Los Angeles when she was six years old, usually in his bedroom. She answered affirmatively when asked if "this stuff happened" more than five times. On cross-examination, she said she never *916 told anyone about defendant's earlier assaults when they happened.
C. Esmeralda's Testimony
Esmeralda testified that as of April 17, 2011, she lived in a house in Oakley, California with her husband, children, sister-in-law and sister-in-law's child. Jane Doe I was her husband's niece and defendant was married to another of Esmeralda's sisters-in-law.
On the weekend of April 17, 2011, Esmeralda said, defendant, his wife and their children stayed at her house in order to attend a family birthday party at Esmeralda's house on Saturday and a family baby shower on the same street on Sunday. Defendant and his family had stayed at her house before and had permission to sleep in the living room or bedrooms, but Esmeralda could not recall whether defendant slept in her bedroom that weekend. However, Esmeralda said, she never would have given him permission to go into her house or her bedroom to sexually assault Jane Doe I.
*217 Esmeralda said that on the day of the baby shower, she left her house around 4 p.m. to attend the baby shower. Jane Doe I stayed behind to change her blouse. Defendant was making himself coffee in Esmeralda's kitchen. After 10 to 15 minutes at the baby shower, Esmeralda walked back to her house with her daughter to get a sweatshirt, with her daughter walking a little ahead of her. Esmeralda's daughter went into the house and to Esmeralda's bedroom, pushed open the door and ran into the room. The door had a lock on it, but it did not lock readily. Esmeralda saw defendant walk out of her bedroom and go towards the kitchen. She went into her bedroom, where Jane Doe I was sitting on the bed lifting up her pants and underwear, which were inches above her knees. When Esmeralda asked Jane Doe I what was going on, Jane Doe I ran into the next room. Esmeralda followed her and they talked. Jane Doe I said defendant "had touched her." Esmeralda told her to tell her mother.
D. Testimony Regarding Jane Doe I's Medical Examination
A forensic examiner at the Contra Costa Regional Medical Center testified that she conducted a sexual assault examination of Jane Doe I on April 21, 2011, four days after the incident. Jane Doe I told the examiner that defendant took off her clothes and pushed her onto a bed in a room. Defendant, while on top of her, put his "weenie," a word she used for penis, in her "privacy," a word she used for vagina, "[a]nd was going up and down and in and out and it hurt a lot." He put her legs on his shoulders, also put his weenie in her "cola," a word she used for her anus, and kissed her on the mouth. During his assault of her, she hurt a lot in her "cola" and "privacy."
The examiner used blue dye to search for tearing or breakage of the skin that was not observable with the naked eye, and photographs of the examination were admitted into evidence. The examiner found a tear or rip in the skin of the perineum, which is between the anal and vaginal openings, but she did not document any injuries internally during the course of a vaginal speculum exam. She also found some internal bruising in Jane Doe I's anus.
E. Expert Testimony on Child Abuse
A pediatrician with Contra Costa County Health Services testified as an expert on child abuse and the interpretation of the forensic examiner's exam of Jane Doe I. The expert reviewed the forensic examiner's report of her examination of Jane Doe I. He noted the anal region showed a *917 healing fissure of the anal ring, an injury that was "fairly recent and certainly consistent with ... four days," and which could have been caused by penetration if the area was stretched more than it could accommodate. Also, the anoscopic exam inside Jane Doe I's rectum showed a large bruise of the rectal mucosa tissue. This *218 was "significant" because "[p]retty much you need to have an erect penis just to penetrate beyond the anus. ... [M]ost sodomy victims don't get bruises here." Also, there was a recent abrasion or laceration of the perineum, which he thought was caused by a rubbing or stretching trauma. It was "often ... associated with both penetration and attempted penetration of the anus and vagina." The examination results were consistent with Jane Doe I's reported history.
The expert also opined that in a majority of cases, child sexual abuse is kept a secret. The children who do make revelations often do so "days, weeks, years after the event," often revealing only part of what happened. Children have trouble disclosing to one interviewer versus another and sometimes will retract things because of influence from family members. Also, children's ability to talk about what happened is often affected by their own fear and shame. Sodomy is "the part of sexual contact that is least likely to be shared" because of the shame attached to it. The majority of studies indicated that children, rather than exaggerate, make a partial revelation, if they make a revelation at all.
F. Defendant's Statements to Police
On May 5, 2011, Detective Jose Rivera of the Contra Costa County Sheriff's Office conducted a video-recorded interrogation of defendant that was admitted into evidence and played for the jury.[3]
Defendant said that he stayed in Oakley with his family about three weeks before for two family events, a birthday party and a baby shower, although he did not attend the baby shower. Rivera told him that a 12-year-old girl told her mother that defendant had "fooled around with her" and "abused" her during the visit. Defendant, after confirming with Rivera that the girl had accused him of "raping" her, denied abusing her. He said she was "sick for sex" and that " 'the way [she] grabbed me ... she wants sex like crazy.' "
Rivera asked defendant to clarify what he meant. Defendant said the girl "stuck her hand in me" when they were watching television with other children, and that he stood up and told her, " 'No.' " He "had a hard on," but "didn't do anything to her there." Instead, he went to have some coffee, and then went to a room in the house where he kept some clothes. When he went in the room, the girl was there and said, " 'Close the door, uncle!' " She hugged him, put her hand inside of his pants and grabbed him, causing him to "lose [his] mind." Her pants were off and her underwear was on. He told her, *219 " 'No, no, no, no,' " and referred to his coffee. He left the room, the girl stayed there, and his brother-in-law's wife went into the room. Defendant suggested to Rivera that "they" had "hit" the girl shortly before this incident because "she was kind of teary-eyed."
Rivera then told defendant that the girl said defendant had put his penis in her vagina, and also that the girl had been medically examined. After Rivera implied that the medical exam indicated defendant *918 had put his penis in the girl's vagina,[4] defendant admitted that he had. He said if the doctor said he had, "well, that's it, like he says, it was put inside her." Asked further questions, defendant said he had sex with the girl with his pants down and her legs on his shoulders, and that she was "asking for it like crazy." He thought she was 14 years old.
Defendant then gave a variety of different accounts of the incident. He said that "[w]hen this little girl climbed on top of me there on the bed, I couldn't get it up." He was not sure he put his penis in the girl's vagina because he "wasn't lucky; it didn't want to stand up." Asked to describe events from when he entered the room, defendant said "she made me lose my mind." She closed the door to the room and put her hand "inside," but he could not "get it up" because he was too nervous they would be caught. She pleaded with him to "make love" to her. She climbed on top of him as he lay on the bed, but he "didn't feel that I put it in because ... I know that there were people outside." She was "pretty strong," and "pulled it out" of him. She pulled on "it" and wanted to "stick it inside her." He told her " 'No, no,' " because there were people outside, and tried to push her off him.
Defendant also said he had become erect when the girl was on top of him. He "didn't put it in her that much," but he "might have put it inside her just a little bit," "because she's really chubby." Defendant also said that if the girl became comfortable with Rivera, Rivera would "see how she gets all over you." He continued, "Her mind is sick and she wants sex," and looks on the Internet "at all that." He suggested she had flirted with him before but, he said, "to be honest, I've never liked chubby women."
Asked how long the girl was on top of him, defendant said she was only on top of him for about thirty seconds. He said he told her, " 'No, honey,' " and " 'Hold on, hold on,' " but she did not care. He repeatedly said he felt his penis did not penetrate the girl, and added, "Because, honestly, on that girl, you can't even see where it can go inside." He did not ejaculate with the girl and did not sustain an erection. He was "positive that it didn't get erected" because she was too chubby for him.
*220 Defendant also said he had sex the night before with his wife, wiped himself on his wife's t-shirt and threw the shirt on the floor. When he was with the girl, "the door was halfway open. I knew if someone came in they would find us. And that's when I wanted to, honestly, because I thought and said, 'Why did I do it last night? Then I maybe could have done it right now.' Right? 'Why did I do this to my wife?' " When Rivera showed him a medical report and indicated defendant's sperm was found, defendant said he had not showered from the night before. He repeatedly denied penetrating Jane Doe I's vagina or anus.
Defendant also claimed that even if he went to jail, the girl should tell the truth when she came of age, and that "it wasn't me who did this to her." He said repeatedly that when he went into the room, "[s]he wanted me," and that he thought she was "kind of sick." He also thought it was "very weird" that her father took a bath for a couple of hours with "them," apparently including the girl. Eventually, defendant indicated he wanted to talk to a lawyer and the interrogation stopped.
*919 G. Jane Doe II's Testimony**
II.
The Defense Case
A. Criminalist Testimony
A criminalist with the Contra Costa County Sheriff's Office Crime Laboratory testified about the sexual assault examination evidence. Given the time that had passed since the alleged assault and other circumstances, she examined only those items that she thought, based on her training and experience, might show indications of sperm. These were a vaginal smear, a cervical swab and a rectal swab. She did not find any sperm.
B. Expert Testimony
A registered nurse and forensic sexual assault nurse examiner testified as an expert in sexual assault examinations, the interpretation of those results and the protocol in conducting them. She had reviewed the materials and photographs collected in the sexual assault examination of Jane Doe I and did not find any definitive evidence that penetration had occurred. She testified *221 that abrasions on the perineum are much more frequently caused by rubbing of clothing or a person scratching herself than from sexual activity. She did not think the abrasion found on Jane Doe I's perineum was caused by penetration because it was too far from any opening where penetration could occur.
The expert also disagreed that the photographs of Jane Doe I's rectum showed an internal bruise that was consistent with blunt force trauma, instead characterizing what she saw as a "coloration possibly." She said injuries from sexual activity are more likely to be in the vulva. She did not observe any injuries to Jane Doe I's vulva and found no physical evidence that was absolutely predictive of prior sexual activity.
C. Defendant's Testimony
Defendant testified that he, his wife, and children stayed in Esmeralda's room on the weekend of April 17, 2011, and kept their clothes, suitcases, and possessions there as well. He and his wife slept in one bed and his children slept in another. He had sex with his wife the night before the baby shower.
Defendant further testified that on the day of the baby shower, he was outside Esmeralda's house with other relatives and friends. He went inside to get money from his pants, which were in Esmeralda's room. When he opened the door to the room and walked in, he was surprised to see Jane Doe I lying on a bed with her pants down. He left the room after about 40 seconds. He did not touch Jane Doe I or take her clothes off, and she did not touch him. Jane Doe I and her family would occasionally visit his family, but he did not touch her or take off her clothes on any occasion.
Defendant was asked to explain his statements to Detective Rivera. He testified that one of his brothers-in-law told him things indicating he would be harmed in prison by the brother-in-law's friends. As a result, he felt threatened and thought someone was going to hurt him; he indicated this led him to make untrue statements to Rivera about physical contact between himself and Jane Doe I, and about Jane Doe I's behavior, because he wanted Rivera to arrest him in order to protect him. In fact, Jane Doe I did not touch him or get on top of him. He also made inaccurate statements because, he said, Rivera "was pressing me in such a way that he wanted me to say something." Although Rivera did *920 not threaten him, he felt "press[ed]" because of the way Detective Rivera was asking him questions and looking at him. Defendant also was confused about which girl Rivera was referring to, since there was another, older girl also present at the party that weekend, although defendant did not have sexual contact with her either. He also never inappropriately touched Jane Doe II. *222 III.
Jury Verdict and Sentencing
The jury found defendant guilty of committing aggravated rape and aggravated sodomy on a child under the age of 14 who was 7 or more years younger than defendant (counts one and two). It also found him guilty of committing a forcible lewd act upon a child under the age of 14 (count five), and found true the accompanying allegations that he committed this act during the commission of a first degree burglary and in the course of having substantial sexual conduct with Jane Doe I.
Based on the jury's verdict and findings on count five and the related first degree burglary allegation, the trial court sentenced defendant to life without the possibility of parole. It imposed consecutive terms of 15 years to life for defendant's convictions on counts one and two, but stayed these terms under section 654. Defendant filed a timely notice of appeal.
DISCUSSION
I.
Defendant's Challenges to the Jury Finding That He Committed a First Degree Burglary Lack Merit.
Defendant first argues that the evidence was insufficient to support the jury finding that he committed a first degree burglary. He fashions this argument as one about the insufficiency of the evidence, but his contention is primarily a legal one: that as an invited overnight guest staying in the room where the incident with Jane Doe I occurred, he could not as a matter of law have committed a first degree burglary. We first address this legal contention, and then address the sufficiency of the evidence to support the finding.
A. Defendant Could as a Matter of Law Be Found to Have Committed First Degree Burglary.
The jury found defendant guilty of committing a forcible lewd act upon a child under the age of 14 during the commission of a first degree burglary, which led to the court imposing a mandatory sentence of life without the possibility of parole. Defendant contends we must reverse the jury's finding that he committed a burglary because, as an "invited guest in the home where the assault allegedly occurred and because the room in which it occurred was *223 the room where he was staying with permission of the owner during the visit, his conduct did not meet the legal definition [of] burglary." This is incorrect.
Defendant's argument requires that we interpret the burglary statute, section 459, which is an issue of law that we determine de novo. (See Kavanaugh v. West Sonoma County Union High School Dist. (2003) 29 Cal.4th 911, 916, 129 Cal.Rptr.2d 811, 62 P.3d 54.) Defendant was sentenced to life without the possibility of parole under section 667.61, the so-called "One Strike" law. ( People v. Sasser (2015) 61 Cal.4th 1, 7, 186 Cal.Rptr.3d 540, 347 P.3d 522.) The One Strike law was " 'enacted to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction.' " ( People v. Luna (2012) 209 Cal.App.4th 460, 471, 146 Cal.Rptr.3d 841.) "Heightened sentences are intended when 'the nature *921 or method of the sex offense "place[d] the victim in a position of elevated vulnerability ." ' " ( Ibid . ) Under the One Strike law, a court "shall" sentence persons who commit, among other things, a forcible lewd act upon a child under the age of 14 (see §§ 667.61, subd. (c)(4), 288, subd. (b)) during the commission of a first degree burglary (see § 667.61, subd. (d)(4)) to "imprisonment in the state prison for life without the possibility of parole." (§ 667.61, subd. (j)(1).)
A person commits burglary when he or she "enters any house [or] room ... with intent to commit grand or petit larceny or any felony." ( § 459.) "Every burglary of an inhabited dwelling house ... is burglary of the first degree." (§ 460, subd. (a).) "[S]ince burglary is a breach of the occupant's possessory rights, a person who enters a structure enumerated in section 459 with the intent to commit a felony is guilty of burglary ...." ( People v. Salemme (1992) 2 Cal.App.4th 775, 781, 3 Cal.Rptr.2d 398.) There are two exceptions, for persons who, first, have "an unconditional possessory right to enter as the occupant of that structure" or, second, are "invited in by the occupant who knows of and endorses the felonious intent." ( Ibid . )
"[A] possessory right is the right to exert control over property to the exclusion of others." ( People v. Salemme , supra , 2 Cal.App.4th at p. 779, 3 Cal.Rptr.2d 398, citing People v. Gauze (1975) 15 Cal.3d 709, 713, 125 Cal.Rptr. 773, 542 P.2d 1365 ( Gauze ).) "A person has a right to be in a structure when he or she has an unconditional possessory right to enter ... or where the person has expressly or impliedly been invited to enter and does so for a lawful reason." ( Salemme , at p. 779, 3 Cal.Rptr.2d 398.) Thus, homeowners and permanent occupants cannot commit a burglary in their own dwelling because they cannot intrude on their own possessory right. For example, in Gauze , a defendant was convicted of assault with a deadly weapon and burglary when he quarreled with one of his two roommates in their apartment, left and then reentered the apartment with *224 a shotgun and shot the roommate. ( Gauze , at p. 711, 125 Cal.Rptr. 773, 542 P.2d 1365.) The appellate court reversed the burglary conviction because "defendant cannot be guilty of burglarizing his own home. His entry into the apartment, even for a felonious purpose, invaded no possessory right of habitation .... More importantly, defendant had an absolute right to enter the apartment ... that could not be conditioned on the consent of defendant's roommates." ( Id . at p. 714, 125 Cal.Rptr. 773, 542 P.2d 1365.)
Defendant argues that an invited overnight guest falls under this "possessory right" exception and, therefore, as a matter of law, he could not burglarize the room in Esmeralda's house where he was staying and where the incident with Jane Doe I occurred. As defendant acknowledges, there are cases where invited guests in homes were found to have burglarized rooms in those homes. (See People v. Abilez (2007) 41 Cal.4th 472, 508-509, 61 Cal.Rptr.3d 526, 161 P.3d 58 [defendant found guilty of burglarizing his mother's room in her home, although he lived in the home]; People v. Richardson (2004) 117 Cal.App.4th 570, 11 Cal.Rptr.3d 802 [defendant invited to stay on the living room couch burglarized the bedrooms of his sister and her roommate by his unauthorized entry into, and taking items from, those rooms].)[5] He argues that Esmeralda authorized *922 him to enter her bedroom that weekend, while the guests in Abilez and Richardson had no equivalent authorization. He further contends that "he had a sufficient interest in occupying the room that the burglary statute served no purpose to protect against unauthorized entry, especially where Jane Doe I was not an overnight guest in the residence or invited to stay in that room, giving her an expectation of protection against [defendant's] entry. As the court in Gauze noted, burglary statutes are designed to protect a possessory interest and not to 'preserve any place from all crime.' ( People v. Gauze , supra , 15 Cal.3d at [p.] 713 [125 Cal.Rptr. 773, 542 P.2d 1365].)"
Defendant's reliance on his status as an invited overnight guest is misplaced. As an invitee, he did not have an unconditional possessory right in Esmeralda's bedroom; nor, as Esmeralda testified, did he have her consent to enter her bedroom in order to commit a forcible lewd act against Jane Doe I. That is what is required to establish an exception to the burglary statute. (See, e.g., In re Andrew I . (1991) 230 Cal.App.3d 572, 579, 281 Cal.Rptr. 570 *225 ["Permission to enter, whether express or implied, does not confer upon the entrant an unconditional possessory interest in the premises. These two concepts are not synonymous"].)
Further, that Jane Doe I may not have a possessory interest in the room is not relevant. Esmeralda, as homeowner, did have a possessory interest, which included an interest in protecting her visitors, such as her niece Jane Doe I, from an invited guest's unauthorized entry into a room of her home to commit a felony.
Defendant also implies that an overnight guest in a home has a constitutional privacy interest that is implicated if we conclude that he could commit a burglary in Esmeralda's room. Defendant relies entirely on a United States Supreme Court case, Minnesota v. Olson (1990) 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85. The case involved the police entering a house without a warrant or consent in order to arrest an overnight guest staying there, which the court determined violated the guest's privacy and Fourth Amendment rights. ( Id. at p. 93, 110 S.Ct. 1684.) Defendant does not show how these rights have any bearing here, and it is not apparent that they do.
In short, we conclude that as a matter of law, defendant, as an invited overnight guest in Esmeralda's home, could be found to have burglarized the room in which he was staying in order to commit a forcible lewd act against Jane Doe I.
B. Sufficient Evidence Supports the Jury's Finding That the Count Five Burglary Allegation Was True.
Defendant frames his argument about the burglary allegation as a challenge to the sufficiency of the evidence that he committed a burglary. We conclude there was sufficient evidence.
When reviewing the sufficiency of evidence, the appellate court must "review the whole record in the light most favorable to the judgment below to determine *923 whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ( People v. Johnson (1980) 26 Cal.3d 557, 562, 162 Cal.Rptr. 431, 606 P.2d 738.) "Substantial evidence" is " 'evidence that "reasonably inspires confidence and is of 'solid value.' " ' " ( People v. Marshall (1997) 15 Cal.4th 1, 34, 61 Cal.Rptr.2d 84, 931 P.2d 262.) "We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the [decision maker] reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not *226 warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." ( People v. Jennings (2010) 50 Cal.4th 616, 638-639, 114 Cal.Rptr.3d 133, 237 P.3d 474.)
As we have discussed, the burglary statute requires that a defendant enter into a house or room with the intent to commit a felony . ( § 459 ; see People v. Sparks, supra , 28 Cal.4th at pp. 73-74, 120 Cal.Rptr.2d 508, 47 P.3d 289.) Defendant does not dispute on appeal that he entered Esmeralda's bedroom and committed felony sexual assaults, including a forcible lewd act against Jane Doe I. Jane Doe I's statements provide substantial evidence that defendant, at the time he entered Esmeralda's room, had already formed the intent to commit this forcible lewd act. Jane Doe I told the forensic interviewer at the Children's Interview Center that defendant came into the bedroom where she was fixing her hair, left and then reentered the room, closing and locking the door as he reentered. She testified that when he came back into the room he "just started looking around if nobody was coming." In both accounts, Jane Doe I indicated that defendant then proceeded to sexually assault her. It can be reasonably inferred from this evidence that defendant entered the room with the intent to commit a felony, i.e., a forcible lewd act against her. We therefore find that sufficient evidence supports the jury's finding that defendant committed a first degree burglary.
II.
The Trial Court Erred in Its Burglary Instruction to the Jury, But Its Error Was Harmless.
Defendant next contends that the trial court's jury instruction on burglary "misdescribes an element" of the offense, misstates a defense upon which he did not rely, and relieved the prosecution of the burden of proving beyond a reasonable doubt each element of first degree burglary. He claims this prejudicially violated his federal constitutional right to due process and requires that his sentence of life without the possibility of parole be vacated. We conclude the court's instruction was erroneous, but the error was harmless.
A. The Relevant Proceedings Below
The trial court instructed the jury on the elements of burglary using a modified version of CALCRIM No. 3178. Its instruction included the following: "The owner of a home may give a guest conditional or unconditional permission to enter his/her home or a room in that home. It is a defense to burglary that the defendant entered the room with the unconditional permission of the owner of the residence. It is not a defense to burglary if the *227 defendant entered the room for a purpose which was not explicitly or impliedly agreed to by the owner. ... The People must ... prove that at the time he entered the room the owner of the residence had not consented to his entry into the room for that purpose." (Italics added.) *924 In his closing argument, the prosecutor contended defendant's conduct was not the typical burglary, i.e., "someone breaking into a home." He told the jury to determine the burglary allegation in part based on whether "the defendant entered the room for a purpose which was not explicitly or implicitly agreed to by the owner."
Defense counsel did not object to the prosecutor's characterization of the consent issue. To the contrary, in his own closing remarks, defense counsel agreed that, as the prosecutor "pointed out[,] in our traditional concept of burglary, is the masked man breaking into the house in the middle of the night to steal your VCR or whatever. ... [¶] Here we don't have anything close to that. We have conflicting evidence of what happened, but somebody enters a room-somebody enters a room where they keep their possessions. That's Mr. Garcia, in his room, where he keeps his possessions. Mr. Garcia enters a room where he spent the night. Mr. Garcia has a room where his money, wallet and clothes are. He enters a room, and the person in the room, (Jane Doe No. 1), it's not even her room, it's her Aunt Esmeralda's room."
Then defense counsel, after noting that defendant was required to have the intent to commit the charged offense when he entered Esmeralda's bedroom, stated, "And, again, if Mr. Garcia broke into some stranger's house or if that was evidence, you know, and then-and started attacking them, whatever, that's a whole different situation than what we have here. [¶] And I don't disagree with arguments counsel made about the consent by Esmeralda. He is absolutely correct. I'm not here to attack his interpretation of the law, but this is a factual determination that you have to determine."
B. Analysis
Defendant implies the trial court should not have given any instruction about the homeowner's consent because he did not raise this defense. We disagree. " 'The law imposes on a trial court the sua sponte duty to properly instruct the jury on the relevant law ....' " ( People v. Hernandez (2010) 181 Cal.App.4th 1494, 1499, 105 Cal.Rptr.3d 597.) Although defendant did not explicitly rely on a consent defense, his attorney suggested this defense when he contended that this was not a normal burglary because defendant was staying, and keeping his possessions, in the room where the incident occurred, and that this was not Jane Doe I's room. Thus, the defense put at *228 issue the scope of defendant's authority from Esmeralda to use the room. Therefore, we have no quarrel with the trial court providing an instruction on the issue of consent.
However, we agree with defendant that the trial court provided an erroneous instruction on the issue of consent. We review de novo whether a court's jury instructions correctly state the law. ( People v. Jackson (2010) 190 Cal.App.4th 918, 923, 118 Cal.Rptr.3d 623.) Put simply, "[a]ny person who enters a building or room with the intent to commit larceny or any felony is guilty of burglary ( § 459 )." ( People v. Castaneda (2011) 51 Cal.4th 1292, 1325, 127 Cal.Rptr.3d 200, 254 P.3d 249.) In other words, as defendant points out, the absence of consent is not an element of a burglary; rather consent is a defense. (See, e.g., People v. Felix (1994) 23 Cal.App.4th 1385, 1397, 28 Cal.Rptr.2d 860 ( Felix ) ["There are occasions when consent given by the owner of the property will constitute a defense to a burglary charge"].) The trial court erred when it instructed the jury that the prosecution had to show an absence of consent, in *925 effect adding an extra element that the prosecution was not legally required to prove.
Defendant also contends the trial court incorrectly indicated it was a defense to a burglary charge that the homeowner "impliedly" agreed to the commission of the underlying felony in the home. We agree. The conduct of a property owner who "actively invites" a person to enter the property "knowing the illegal, felonious intention in the mind of the invitee" may be the basis for a defense to burglary, "[b]ut the invitation by the owner to enter must be express and clear ; merely standing by or passively permitting the entry will not do." ( Felix , supra , 23 Cal.App.4th at pp. 1397-1398, 28 Cal.Rptr.2d 860, final italics added.) Thus, in Felix , the court held the defendant was not entitled to a jury instruction on a defense to a burglary charge that was based on his sister's implied consent to his entry into her home, even though she testified that there was "a silent family understanding that any of them could come and go from her home at will." ( Id . at p. 1399, 28 Cal.Rptr.2d 860.) The trial court's instruction here indicated such an understanding was sufficient, i.e., "[i]t is not a defense to burglary if the defendant entered the room for a purpose which was not explicitly or impliedly agreed to by the owner." (Italics added.) This was also error.
But these two errors favored defendant and, therefore, we conclude they were harmless. Regarding the first error, the addition of an "absence of consent" element to burglary, defendant argues the prosecutor focused on this "inapplicable and erroneous principle to argue that the jury should not consider that [defendant] had a possessory right in the room which prevented a finding of burglary" and, that the trial court somehow directed a verdict on this issue. As we have discussed, there is no law or evidence that, as an *229 invited overnight guest, defendant had an unconditional possessory right as an invited overnight guest. Further, the added element increased the prosecution's burden and gave the jury an unwarranted basis for finding the burglary allegation un true. Therefore, defendant was not prejudiced by the error.
Similarly, regarding the second error, as the People contend, "the instruction, by permitting implicit as well as explicit agreements, could only have helped" the defendant's case. We agree. By allowing the jury to consider implied consent, the court gave defendant a greater, not lesser, chance of defeating the burglary allegation. Nonetheless, the jury's verdict of guilt indicated it found there was no consent-express or implied. No rational juror could have found otherwise, as no evidence indicates that Esmeralda or any member of her family consented to defendant's entry of Esmeralda's bedroom for the purpose of committing a forcible lewd act against Jane Doe I. We conclude the trial court's errors were harmless, whether evaluated under the federal or state standard for prejudice. (See Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 [federal]; People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243 [state].)[6]
III.-V.***
DISPOSITION
The judgment is affirmed.
*926 We concur.
KLINE, P.J.
RICHMAN, J.

All statutory references are to the Penal Code unless otherwise stated.

The video-recording is not contained in the record. We summarize the interview from a transcript of the interview that was admitted into evidence to aid the jury's review of the video-recording.

This video recording also is not contained in the record. We summarize the interrogation from a transcript that was admitted into evidence to aid the jury's review of the recording. The transcript is an English translation of the interrogation, which was conducted in Spanish.

Rivera testified at trial that, at the time of the interrogation, this statement was inaccurate and that he used it as a questioning technique.

See footnote *, ante.

Further, case law makes clear that a person can be found guilty of burglary when engaging in an unauthorized entry for the purpose of committing a felony sexual assault, such as rape. (See People v. Fond (1999) 71 Cal.App.4th 127, 83 Cal.Rptr.2d 660 [defendant was properly convicted of first degree burglary when, while a patient in a locked psychiatric hospital, he raped a female patient in the female patient's hospital room].)
Also, it is of no consequence whether defendant formed his felonious intent when he was already in Esmeralda's house. (People v. Sparks (2002) 28 Cal.4th 71, 73, 120 Cal.Rptr.2d 508, 47 P.3d 289 [concluding that "a defendant's entry into a bedroom within a single-family house with the requisite intent" can support a burglary conviction although "that intent was formed only after the defendant's entry into the house"].)

In light of our conclusions, we have no need to, and do not, resolve the parties' disagreement over whether the federal or state standard applies here.

See footnote *, ante.